Tony LEE, et al., Plaintiffs, Appellants,

v.

The LIFE INSURANCE COMPANY
OF NORTH AMERICA, et al.,
Defendants, Appellees.

No. 93–1988.

United States Court of Appeals,
First Circuit.

Heard Feb. 7, 1994.

Decided May 4, 1994.

Sinclair T. Banks, West Kingston, RI, with whom Keven A. McKenna, Providence, RI, was on brief for appellants.

Jay S. Goodman, Providence, RI, for the University of Rhode Island, et al.

William P. Devereaux and McGovern, Noel & Benik, Inc., Providence, RI, on brief for The Life Insurance Co. of North America.

Phillip A. Proger, with whom Gregory A. Castanias and Jones, Day, Reavis & Pogue, Washington, DC, were on brief for The Life Insurance Co. of North America, and for all appellees on anti-trust issues.

Before TORRUELLA, Circuit Judge, ALDRICH, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Three University of Rhode Island ("URI") students appeal from a district court order dismissing their federal antitrust, equal protection, and due process claims against URI, its Board of Governors, three URI officials, and URI's student-health insurer, Life Insurance Company of North America ("LINA"). Finding no error, we affirm the district court judgment.

# I

## BACKGROUND

As a precondition to reregistering each semester, URI requires all full-time undergraduate students to pay a fixed fee for the right to use URI's on-campus, walk-in medical clinic, University Health Services ("UHS").[1] All students who pay the UHS clinic fee must also carry supplemental health insurance coverage for certain medical services, such as x-rays, lab tests and gynecological tests, that are available through UHS. Two supplemental insurance options are available. First, the student may obtain

supplemental insurance through LINA, a private health care underwriter which URI sponsors as its "default" insurer. LINA purportedly "dovetails" its supplemental coverage so that the insured student pays an annual premium that minimizes duplicative coverage; that is, it *lessens* the risk that the LINA premium and the UHS clinic fee will reflect redundant coverage for the *same* medical procedures.[2] As a second option, students may secure "comparable [supplemental] coverage" from an off-campus health care insurer of their choice, except that URI does not consider either Rhode Island Blue Cross or Rhode Island-based HMOs "comparable coverage." Students who do not opt out of the LINA "default" coverage by a specified deadline are automatically billed for the annual LINA premium, and cannot reregister for the following semester until the LINA premium has been paid. The automatic "default" scheme notwithstanding, only about 40% of the students who pay the UHS clinic fee insure through LINA.

Appellants initiated this class action in federal district court against URI and LINA in January 1992. The amended complaint alleges that the practice of conditioning continued matriculation at URI on payment of the UHS clinic fee and/or the LINA supplemental insurance premium violates the Sherman Antitrust Act, 15 U.S.C. § 1 (1993), as well as the equal protection and due process guarantees under the United States Constitution. Following minimal discovery, URI and LINA moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6),[3] and the district court dismissed all claims. *Lee v. Life Ins. Co. of N.A.*, 829 F.Supp. 529 (D.R.I.1993).[4]

# II

## DISCUSSION

### A. The Antitrust "Tying" Claim

 Appellants challenge the dismissal of their claim that the URI health care-

---

1. Graduate students are not required to pay the UHS clinic fee, provided they have health insurance coverage that meets URI's requirements.

2. LINA coverage requires the student to present for treatment at UHS in the *first* instance, pending possible referral to an outside health care provider.

3. Appellants' motion for class certification was stayed pending disposition of appellees' motions to dismiss.

4. At the same time, the district court declined to exercise jurisdiction over several pendent state-law claims, *see* 28 U.S.C. § 1367(c)(3) (1993). *Cf. infra* note 11.

insurance scheme is an impermissible "tying" arrangement in violation of the Sherman Act, 15 U.S.C. § 1 (1993) ("Every contract . . . in restraint of trade or commerce . . . is hereby declared to be illegal."). *See Eastman Kodak Co. v. Image Technical Servs., Inc.,* —— U.S. ——, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) ("*Kodak*"). "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" *Id.* at ——, 112 S.Ct. at 2079 (quoting *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 519, 2 L.Ed.2d 545 (1958)). Generally speaking, an impermissible "tie-in" occurs if a seller (*viz.,* URI) enjoys either a monopoly or "appreciable economic power" ("AEP") in the "tying" product (or service) market, and uses its considerable market leverage to "coerce" a buyer—already intent on purchasing the tying product from the seller—into buying a second, "tied" product that the buyer would not have bought based solely on the quality or price of the tied product itself. *See Fortner Enters., Inc. v. United States Steel Corp.,* 394 U.S. 495, 503, 89 S.Ct. 1252, 1258–59, 22 L.Ed.2d 495 (1969); *see generally Grappone, Inc. v. Subaru of New England, Inc.,* 858 F.2d 792, 794–96 (1st Cir.1988) (describing procompetitive policy interests animating *per se* tying analysis).[5] Since many product "ties" may not prove anti-competitive, notwithstanding their somewhat misleading epithet, "*per se*" tie-ins may require a "fairly subtle antitrust analysis" of "market power," a fact-intensive inqui-ry aimed at winnowing out only those ties most likely to threaten anti-competitive harm. *Id.* at 795.

■ Appellants claim three "product" tie-ins: (1) between a university education (URI) and health insurance coverage (LINA); (2) between health care services (UHS) and health insurance coverage (LINA); and (3) between a university education (URI) and health care services (UHS).[6] We agree with the district court however, that appellants failed to allege *any* "tie-in" claim upon which relief could be granted. In particular, appellants failed to advance a colorable claim as to an *indispensable* element: that URI had AEP in the relevant tying markets (university education and health care services). AEP or "market power" is the demonstrated ability of a seller "to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 14, 104 S.Ct. 1551, 1559, 80 L.Ed.2d 2 (1984); *see also Grappone,* 858 F.2d at 794. AEP may be demonstrated, for example, if the seller holds a monopoly in the tying product (*e.g.,* a patented product), controls a very large share of sales in the tying product market, *see id.* at 796 (AEP "means *significant* market power" over an "'appreciable' number of buyers") (emphasis in original) (citation omitted), or produces a "unique" tying product, and therefore faces no significant competition from functionally similar products or services, *see Jefferson Parish,* 466 U.S. at 37–38 n. 7, 104 S.Ct. at 1571–72 n. 7 (O'Connor, J., concurring) (market must be

---

**5.** The tie-in must also affect a substantial volume of commerce in the tied market, *see Kodak,* —— U.S. at ——, 112 S.Ct. at 2079, a factor not at issue in this case. Further, we assume, *without deciding,* that URI is a participant in the insurance "market," for antitrust purposes, simply because it receives a one-time $10 processing fee for each LINA policy sold to a URI student.

**6.** Notwithstanding certain misgivings, we further assume, *without deciding,* that the amended complaint adequately pleads two other essential "tying" claim elements. These assumptions merely facilitate clearer focus on the core deficiency in appellants' antitrust claim. First, we presume that the products at issue are distinct, *i.e.,* that each is distinguishable by consumers in the relevant market, and that there would be sufficient consumer demand for each *individual* product, and not merely as part of an integrated product "package." *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 21–22, 104 S.Ct. 1551, 1563, 80 L.Ed.2d 2 (1984). *But see id.* at 39, 104 S.Ct. at 1572 (O'Connor, J., concurring) (noting obvious policy limits of "two product" rule, since almost every product could be broken down into smaller constituent parts that might be sold separately); *Lee,* 829 F.Supp. at 537 ("I do not believe plaintiffs have adequately alleged that this arrangement involved two separate products."). Second, we accept, *arguendo,* the questionable contention that URI students are "coerced" financially into buying LINA coverage because only LINA insurance "dovetails" with UHS clinic fee services.

defined to include "all reasonable substitutes for the product"); *Grappone*, 858 F.2d at 796 (market encompasses all "readily available substitutes").

Appellants can assert no colorable claim that URI holds AEP *either* in the "tying" market for a university education *or* in the "tying" market for health care services. URI competes for new undergraduate and graduate students on a regional and national level with dozens of universities and colleges.[7] Although URI obviously is a "unique" institution in a colloquial sense, appellants cannot claim that other institutions of higher education do not or cannot provide "functionally similar" educational offerings to potential URI applicants. *Cf. id.* at 798 (brand name alone does not establish product "uniqueness" necessary for AEP). And, of course, absent AEP in the university-education market it is a virtual given that URI cannot enjoy AEP in the student health care business.

■ Appellants attempt to circumvent URI's evident lack of AEP in the two relevant tying markets by contriving a so-called *Kodak* "lock-in." *Kodak* involved distinct products: Kodak copiers (the "lock-in" product), Kodak copier replacement parts (the tying product), and Kodak copier servicing and repair (the tied product). In 1985, Kodak began to confine sales of Kodak copier parts to Kodak copier owners who contracted to have their copiers *serviced* by Kodak, rather than by Kodak's servicing competitors ("ISOs"). *Kodak*, —— U.S. at —— – ——, 112 S.Ct. at 2077–78. Significantly, only Kodak parts would fit Kodak copiers. *Id.* at ——, 112 S.Ct. at 2077. The ISOs initiated an antitrust action against Kodak under section 1 of the Sherman Act. After truncated discovery, the district court granted summary judgment for Kodak. *Id.* at ——, 112 S.Ct. at 2078. The Ninth Circuit reversed, *Kodak*, 903 F.2d 612, 617 (9th Cir.1990), and the Supreme Court affirmed, *Kodak*, —— U.S. at ——, 112 S.Ct. at 2092.

By reason of Kodak's very small market share in copier sales, the parties had stipulated that Kodak had no AEP in the copier market (*assuming* copier sales to be the relevant "tying" market), and hence, no unlawful "tie" could exist between Kodak copiers and Kodak parts-servicing. *Id.* at —— n. 10, 112 S.Ct. at 2081 n. 10. The Supreme Court accordingly focused on whether an unlawful tie-in nonetheless existed between Kodak *parts* and Kodak *servicing. Id.* Kodak argued for the view that, either presumptively or as a matter of law, vigorous competition in the copier market would prevent Kodak from raising its parts and servicing contract prices above competitive levels, because any such price increases in these "derivative aftermarkets" would become known to copier-equipment consumers, and eventually cause Kodak to *lose* ground to its competitors in copier sales. *Id.* at —— – ——, ——, 112 S.Ct. at 2081–82, 2083.

The Court rejected Kodak's *per se* "cross-elasticity of demand" theory, identifying *two* different fact patterns which, if borne out by the evidence, might support a reasonable inference that parts and servicing contract price increases would not necessarily cause Kodak to lose copier sales. Under the first scenario, the evidence might demonstrate that a substantial number of consumers, at the time of their original copier purchases, would not enjoy cost-efficient[8] access to the difficult-to-acquire pricing information needed to evaluate the total "life-cycle" cost of the entire Kodak "package"—namely, the price of the copier, likely replacement parts, and product-lifetime servicing. *Id.* at —— – ——, 112 S.Ct. at 2085–87. Under the second scenario, the Court postulated that, in a market for complex durable goods like copiers, *current* Kodak-copier owners might tolerate even uncompetitive price increases in Kodak parts and servicing as long as the increases did not exceed the costs of abandoning their original investment in the Ko-

---

7. As of 1991, for example, Rhode Island residents comprised only 56% of the URI student body.

8. The Court noted that even assuming readily available price information, consumers rationally

might decide not to investigate life-cycle costs if investigation would prove more costly than the potential savings. *Id.*, —— U.S. at ——, 112 S.Ct. at 2086.

dak copier and switching, for example, to a Canon or Xerox copier. *Id.* at ——–——, 112 S.Ct. at 2087–88. Since Kodak's servicing competitors had produced some evidence of "very high" switching costs for Kodak copier owners, the Court opined that such "lock-ins"—attendant as they are to the original copier purchase—could conceivably enable the plaintiff ISOs to establish Kodak's AEP in the derivative "tying" aftermarket for Kodak parts. The Court accordingly concluded that the undetermined "information costs" and "switching costs" represented material issues of fact, and if in *genuine dispute*, would preclude summary judgment, even though Kodak lacked AEP in the "lock-in" product market for copiers. *Id.* at ——, 112 S.Ct. at 2086–87.

Appellants attempt to shoehorn their allegations into this *Kodak* "derivative aftermarket" mold, by proposing the following comparative model: *first-semester* matriculation at URI serves as the "lock-in" product, as did the Kodak copier; subsequent semesters at URI serve as the tying product, as did Kodak replacement parts; and health clinic services and health insurance coverage represent the tied products. Of course, URI, like Kodak, might contend, on summary judgment or at trial, that its lack of AEP in the locked-in product market ("sales" of first-semester university education) creates a "cross-elasticity of demand," which would prevent health clinic fees and LINA supplemental insurance premiums from being increased to uncompetitive levels. Nevertheless, because *Kodak* was a *summary judgment* case, rather than a Rule 12(b)(6) case, appellants argue that they did enough to withstand URI's motion to dismiss simply by alleging the existence of *unspecified* "information" and "switching" costs, which must be credited for Rule 12(b)(6) purposes. *See Rumford Pharmacy, Inc. v. City of East Providence*, 970 F.2d 996, 997 (1st Cir.1992) (review of Rule 12(b)(6) dismissal is *de novo*, crediting all allegations in the complaint and drawing all reasonable inferences favorable to plaintiff).

Appellants challenge the district court ruling that their "information cost" allegations were insufficient to defeat the motion to dismiss. First, appellants argue that URI cannot posit a "cross-elasticity of demand" in the present context because the prices charged for health clinic services and insurance premiums are too insignificant in relation to tuition and other university-education costs to be considered a meaningful factor in determining whether potential applicants for admission will attend URI or some other university. Alternatively, appellants argue that URI would bear the burden of proof on this issue at trial, and that on appeal it has not pointed to supportive evidence of consumer "sophistication."

Appellants exaggerate the role that summary-judgment burden shifting played in the *Kodak* analysis. *Kodak* simply pointed out that summary judgment was not *yet* in order on Kodak's "cross-elasticity of demand" theory (1) in light of the plaintiff ISOs' proffer on "information costs"—*i.e., readily inferable* expenses associated with accumulating technical information relating to the costs of equipment, parts, and servicing over the lifetime of a "complex durable goods" item, *and* (2) in the absence of any conclusive evidence from Kodak that a substantial number of purchasers *actually* make accurate prepurchase assessments of the life-cycle "package" price of their Kodak copiers. Thus, the Court neither discussed any reallocation of burdens of proof at trial, nor in any way intimated a *shift* in the evidentiary burden of proof on the factual issues of "information costs" and "lock-in." *See, e.g., Jefferson Parish*, 466 U.S. at 13–14, 104 S.Ct. at 1558–59 (assuming burden of proof rests with plaintiff to show AEP in tying-product market); *Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479 n. 12 (3d Cir.) (plaintiff bears burden of proof on "tying market" definition), *cert denied,* —— U.S. ——, 113 S.Ct. 196, 121 L.Ed.2d 139 (1992). In order to withstand URI's motion to dismiss for failure to state a claim, therefore, it was appellants' burden (absent any colorable claim that URI had AEP in the locked-in product markets for university education and student health services) to *allege* "information costs" which would prevent a substantial number of URI students from accurately assessing the total costs of a URI education, including health

clinic fees and insurance premiums, in determining whether to matriculate at URI.

Second, appellants argue that it is impossible to allege "information costs" because potential URI applicants cannot know or predict their future URI health clinic fees and LINA insurance premiums with any precision, since URI and LINA reserve the right to increase these charges each year. But appellants mistake the focus of the Court's concerns about the "information costs" in *Kodak*.

In *Kodak*, the information required by the customer pertained to the life-cycle pricing of a Kodak copier "package," information so patently "difficult and costly" to come by that it spontaneously gave rise to a reasonable inference that unsophisticated consumers would not have the information needed to evaluate their options at the time they made their decision to purchase a Kodak copier. *Kodak*, — U.S. at ——, 112 S.Ct. at 2085.[9] By contrast, before signing up for their first semester at URI, students are informed that their continued matriculation at URI is conditioned, *inter alia*, on their "purchase" of health clinic services at a stated annual fee, subject to historically predictable annual increases, and on their purchase of supplemental insurance coverage.[10] *See* Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1709.2, at 1174 (Supp.1993) (*Kodak* does not

focus on potential exploitation of the "irrational or foolish" purchaser, but the purchaser who makes the rational decision that comparative-shopping costs would outweigh any savings from a fully informed purchase; "the [*Kodak*] context was confined to *hard-to-obtain* information") (emphasis added); *cf. id.* at 1174 ("[R]elevant information need not be so comprehensive as a binding future price schedule. . . ."); *see also supra* note 8. Appellants have made no allegations sufficient to give rise to a reasonable inference that the health-care and insurance-cost information needed to make an informed decision whether to accept the preconditions to continued matriculation at URI is *either difficult or expensive to obtain or correlate.*

The district court further ruled that appellants failed to state an actionable claim that they were "locked in"; that is, they failed to plead actual costs associated with switching from URI after their first semester. Although appellants now assert that they can amend their complaint to allege such costs, we conclude that further amendment to allege specific "switching costs" would be futile. *See University of Rhode Island v. A.W. Chesterton Co.*, 2 F.3d 1200, 1219 n. 20 (1993).

First, there is an important distinction between *Kodak* and the present case. *Kodak*

---

**9.** The *Kodak* Court elaborated on the complexity of the "information" needed to make an informed investment:

In order to arrive at an accurate price, a consumer must acquire a substantial amount of raw data and undertake sophisticated analysis. The necessary information would include data on price, quality, and availability of products needed to operate, upgrade, or enhance the initial equipment, as well as service and repair costs, including estimates of breakdown frequency, nature of repairs, price of service and parts, length of "down-time" and losses incurred from down-time.

Much of this information is difficult—some of it is impossible—to acquire at the time of purchase. During the life of a product, companies may change the service and parts prices, and develop products with more advanced features, a decreased need for repair, or new warranties. In addition, the information is likely to be customer specific; lifecycle costs will vary from customer to customer with the type of equipment, degrees of equipment use, and costs of down-time.

*Kodak*, — U.S. at ——–——, 112 S.Ct. at 2085–86.

**10.** Considering the recent hyperinflationary trends in the health care industry as a whole, UHS clinic fees have increased at fairly predictable increments since 1987: 1987–88 ($179); 1988–89 ($188); 1989–90 ($200.50); 1990–91 ($227); 1991–92 ($248); 1992–93 ($312). LINA premiums have increased comparably over the same period, from $158 in 1987–88 to $369 in 1992–93. The record contains no evidence that prospective URI applicants would have great difficulty gaining access to this information from any number of reliable sources (*e.g.*, URI application materials, URI admissions officials, past or current URI students, college entrance source books). Nor do appellants suggest that URI had any incentive to conceal the scope of past price increases. On the billing invoices it mails to students, URI routinely individualizes its charges for registration, tuition, UHS fees, LINA premiums, and taxes.

was a "derivative aftermarket" case involving "complex durable goods." Unlike the copier parts in *Kodak,* subsequent URI semesters are not "derivative aftermarket" components upon which the buyer's initial investment absolutely depends. As the Supreme Court noted, Kodak copiers are "expensive when new," incompatible with replacement parts used in other copiers, and retain "little resale value" presumably because complex durable goods depreciate so rapidly. *Kodak,* —— U.S. at ——, 112 S.Ct. at 2077. The "lock-in" would occur provided it could be shown that Kodak copier owners must either purchase replacement parts from Kodak or abandon their initial, *unamortized investment* in their Kodak copier. In contrast, a completed first semester at university is discretely priced—students do not pay for their entire four-year stint in advance—and the "college credit" value of the first semester is neither nontransferable nor without economic or educational value in the future even if the student does not remain at URI. Thus, appellants' attempt to extend *Kodak,* beyond the "derivative aftermarket" context to the educational context, is problematic at best.

Second, the *timing* of the "lock-in" at issue in *Kodak* was central to the Supreme Court's decision. Unsophisticated Kodak copier owners were destined for "lock-in" *from the moment they purchased their Kodak copiers.* At the time current Kodak copier owners bought their copiers, Kodak had not yet conditioned its sale of replacement parts on the purchase of Kodak servicing, and its later-announced policy to that effect was made applicable both to prospective *and existing* Kodak copier owners. Had previous customers known, at the time they bought their Kodak copiers, that Kodak would implement

its restrictive parts-servicing policy, Kodak's "market power," *i.e.,* its leverage to induce customers to purchase Kodak servicing, could only have been as significant as its AEP in the *copier market,* which was stipulated to be inconsequential or nonexistent. *See Kodak,* —— U.S. at —— ——, 112 S.Ct. at 2095–96 (Scalia, J., dissenting) (noting that even the *Kodak* majority probably would have found no "lock-in" had Kodak announced its parts-service "tie" at the time of its market entry); *see generally* Philip E. Areeda, *supra,* ¶ 1709.2, at 1164–68 (same). In the instant case, however, students know before their matriculation that they are buying a URI "package" that includes at least two "tied" products—a URI education and on-campus health care services and insurance. As appellants failed to assert a colorable claim that URI had AEP in the primary (university education) market, no *Kodak*-type "lock-in" could have occurred in subsequent semesters, and even the most detailed allegations of "switching costs" would be wholly unavailing.

## B. The "Due Process" and "Equal Protection" Claims

Appellants attempt to raise two vaguely articulated constitutional challenges to the URI health services-insurance scheme. First, they argue that URI's conditioning of continued matriculation on the payment of a health clinic fee violates their constitutional right to procedural due process, by depriving them of a property interest (fees and premiums), and a liberty-privacy interest (the alleged right to retain a physician of one's choice). Unsurprisingly, appellants cite no case authority for either contention, nor have we found any.[11] Appellants purchased a

---

**11.** The district court interpreted appellants' complaint as alleging claims based on substantive due process and the right to contract. Appellants concede that their "cumbersome briefing" contributed to this understanding, yet did not move for reconsideration. *See Vanhaaren v. State Farm Mut. Auto. Ins. Co.,* 989 F.2d 1, 4–5 (1st Cir.1993) (issues raised for the first time on appeal are deemed waived). Unfortunately, the procedural due process claim asserted on appeal is no less unwieldy.

Inexplicably, appellants continue to urge that Rhode Island law disempowered URI from enter-

ing the "business" of health care and insurance, and that the LINA policies were merely a fraud or sham affording students no actual coverage. Although these allegations might be material to appellants' *ultra vires* claim under state law, which the district court dismissed without prejudice, *cf. Boston Envtl. Sanitation Inspectors Ass'n v. City of Boston,* 794 F:2d 12, 13 (1st Cir.1986) (noting that state actor's "[m]ere violation of state statutory requirements does not offend federal constitutional due process"), or conceivably may have served as a basis for some sort of consumer protection claim, appellants do not

"product"-"service" from URI with full knowledge from the outset that health care fees and supplemental insurance premiums were a required component of the cost. We perceive no procedural infirmity.

■ Second, appellants argue that the URI "package" infringes their constitutional right to equal protection of the laws because male and female students matriculating at URI must pay the same health care fees, even though male students will not utilize the UHS gynecological services. The district court aptly found that appellants failed to allege that URI imposed this unitary scheme with any discriminatory animus aimed at male students. *See Nieves v. University of Puerto Rico,* 7 F.3d 270, 276 (1st Cir.1993) (plaintiff contesting classification-neutral statutes on equal protection grounds must proffer not only evidence of disparate effect, but evidence that enactment resulted "because of," rather than "in spite of," classification) (citing *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 278–80, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 896 (1st Cir.1988). Appellants advance no curative allegations for relieving this infirmity.

*Affirmed.*

explain how URI's mere refusal to continue selling them a service (*i.e.,* education) would constitute an actionable "deprivation" of their "property rights" for federal due process purposes. *Cf. id.* (noting that "an alleged breach of contract [by a state actor] does not amount to a deprivation of property without due process"); *Jimenez v. Almodovar,* 650 F.2d 363, 370 (1st Cir.1981) (same).