**Lussier v. Subaru of New England      CV-99-109-B    12/13/99**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


George Lussier Enterprises, Inc.,
d/b/a Lussier Subaru, et al.

      v.                                      Civil No.  C-99-109-B

Subaru of New England, Inc., et al.


**MEMORANDUM AND ORDER**
_____

Seven current and former New England Subaru dealers have

filed a class action complaint against their distributor, Subaru

of New England, Inc. ("SNE").  The dealers contend that SNE

withholds approximately 10% of the new Subaru vehicles destined

for the New England market and illegally requires dealers to

purchase vehicles with expensive accessories such as leather

seats and keyless entry systems in order to obtain any of the

withheld vehicles.  The dealers argue that this practice

constitutes a tying arrangement prohibited by section 1 of the

Sherman Act and section 3 of the Clayton Act, 15 U.S.C. §§ 1 &

14.[1]  SNE has responded with a motion to dismiss arguing that the

_____

[1]  The dealers also assert that SNE breached its dealership
agreements and violated various state dealer protection statutes,
and that both SNE and its sole shareholder, Ernest Boch, violated
the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.
§§ 1961 et seq.  I confine my analysis to the sufficiency of the
dealers' antitrust claim.

dealers have failed to allege that SNE has sufficient power in the market for new Subaru vehicles to restrain competition in the automobile accessory market. I disagree and accordingly deny the motion.

## I.

SNE is the exclusive distributor of Subaru vehicles in New England.[2] In this capacity, it has entered into franchise agreements with all of the region's Subaru dealers. SNE's franchise agreements contain or incorporate by reference certain standard provisions dictated by Subaru's national distributor. One such provision states that "It is understood and agreed that [SNE] will allocate all affected Subaru products equitably, using appropriate factors such as the respective inventory levels and sales performance of [its] dealers during a representative period of time immediately prior to such allocation." Dealership Agreement and Standard Provisions, Defendants' Joint Appendix, Tab A(1) at 9.[3]

---

[2] I take the facts from the complaint and describe them in the light most favorable to the plaintiffs. See Miranda v. Ponce Fed. Bank, 948 F.2d 41, 43 (1st Cir. 1991).

[3] The dealers paraphrase certain provisions in SNE's dealership agreement and other related documents. I quote from the documents, which were supplied by the defendants in support

SNE implemented a vehicle distribution plan on February 1, 1987, dubbed "Fair Share II." Under the plan, SNE allocates 90% of its vehicles to dealerships based upon a formula tied to the number of vehicles each dealership sells during a given allocation period. The plan specifies that the remaining discretionary vehicles may be withheld by SNE and used for "executive vehicles and discretionary purposes such as market action vehicles."[4] Fair Share II Distribution System, Defendants' Joint Appendix, Tab B(2).

_____

of their motion. See Beddall v. State Street Bank and Trust Co., 137 F.3d 12, 16-17 (1st Cir. 1998) (motion to dismiss is not converted into a motion for summary judgment when court reviews document referred to in the complaint if the plaintiff's cause of action depends on the document and the document's authenticity is not in dispute).

[4] The plan elsewhere defines "discretionary vehicles" as "[v]ehicles to be used as demonstrators by Subaru of New England; vehicles to be used for major auto shows; vehicles set aside to assist dealers who, at the sole discretion of Subaru of New England, need assistance and vehicles delivered to VIPs." Defendants' Joint Appendix, Tab B(3) (emphasis in original).

-3-

At some point not specified in the complaint but after the dealers signed their franchise agreements and incurred substantial costs to acquire and develop their dealerships, SNE began to condition a dealer's right to obtain discretionary vehicles on an agreement to purchase vehicles with a variety of pre-installed accessories such as leather seats, CD players, air filtration systems, and keyless entry systems. The dealers claim that this practice is particularly burdensome because SNE withholds as discretionary vehicles a disproportionate number of Subaru's most popular models.

The accessories SNE requires dealers to purchase in order to obtain discretionary vehicles are installed by a contractor working for SNE. Although a distinct market exists for the sale and installation of automobile accessories, SNE is able to force the dealers to pay higher than market rates for accessories by exploiting the demand among the dealers for discretionary vehicles. As a result, the complaint alleges, SNE is able to foreclose a substantial amount of the accessory business that otherwise would have gone to SNE's competitors.

The dealers allege that SNE's practice of conditioning a dealer's right to acquire discretionary vehicles on an agreement to purchase accessories violates its franchise agreements with

-4-

the dealers.  They also allege that SNE intentionally prevented
the dealers from learning of the tying arrangement until after
they had signed their franchise agreements and incurred
substantial costs to develop their dealerships.  Finally, they
claim that they would incur substantial switching costs if they
were to replace their demand for discretionary vehicles with a
competing manufacturer's models.

## II.

The dealers argue both that SNE's tying arrangement is "per
se" unlawful[5] and that it is unlawful under "rule of reason"
analysis.[6]  Because SNE challenges only the dealers' per se tying

---

[5]  While some courts have suggested that a per se tying
violation is a misnomer because "some element of [market] power
must be shown and defenses are effectively available," U.S.
Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 593 n.2
(1st Cir. 1993); see also Town Sound and Custom Tops, Inc. v.
Chrysler Motors Corp., 959 F.2d 468, 477 & n.8 (3d Cir. 1992) (en
banc), the Supreme Court has continued to endorse a per se rule
in the tying context.  See Jefferson Parish Hosp. Dist. No. 2 v.
Hyde, 466 U.S. 2, 9 (1984) ("It is far too late in the history of
our antitrust jurisprudence to question the proposition that
certain tying arrangements pose an unacceptable risk of stifling
competition and therefore are unreasonable 'per se.'").

[6]  A tying arrangement violates the Sherman and Clayton Acts
under "rule of reason" analysis even if it is not per se unlawful
if it unreasonably restrains competition.  See Jefferson Parish,
466 U.S. at 29-31; Grappone, Inc. v. Subaru of New England, Inc.,
858 F.2d 792, 799 (1st Cir. 1988).

claim, I focus my analysis on the sufficiency of this claim.[7]

A tying arrangement ordinarily will be deemed per se unlawful if: (1) it involves a "tying" product and a distinct "tied" product; (2) the seller conditions the right to purchase the tying product on the purchase of the tied product; (3) the seller has sufficient market power in the market for the tying product to appreciably restrain trade in the market for the tied product; and (4) as a result, the seller is able to foreclose a "not insubstantial" amount of interstate commerce in the tied product. See ABA Section of Antitrust Law, Antitrust Law Developments 177-78 (4th ed. 1997). SNE argues here that the dealers' tying claim must be dismissed because it does not adequately allege that SNE has sufficient power in the market for the tying product (in this case new Subaru vehicles) to restrain trade in the market for the tied product (in this case automobile

---

[7] I review the dealers' antitrust claims under the particularly liberal standard articulated by the United States Supreme Court in Hospital Building Company v. Trustees of Rex Hospital, 425 U.S. 738, 746 (1976) ("[I]n antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.") (internal citation omitted). Accordingly, I must deny SNE's motion to dismiss unless the dealers could not prevail even if all of their allegations prove to be true and they are given the benefit of all reasonable inferences. See Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999).

accessories).

SNE bases its argument on the First Circuit's opinion in Grappone, Inc. v. Subaru of New England, Inc., 858 F.2d 792 (1st Cir. 1988). In Grappone, a Subaru dealer brought a tying claim against SNE, alleging that it had conditioned vehicle allocations on the dealer's purchase of spare parts. See id. at 793. The court rejected the dealer's attempt to define the relevant market for the tying product narrowly, in terms of the Subaru brand of automobile, and thereby to assert that SNE wielded power over that market. Rather, because SNE competed with other automobile manufacturers and distributors, the court concluded that "Subaru's market share, whether measured in terms of sales of all autos or of imports or in any other reasonable way, is minuscule." Id. at 797. Because SNE had an insubstantial share of the market for the tying product, and in the absence of any evidence that Subaru automobiles "had any special or unique features, such as patents or copyrights," id. at 798, the court concluded that SNE lacked the market power necessary to force the dealer to purchase the spare parts. See id. at 797. The First Circuit accordingly held that the dealer had "failed to prove that the per se anti-tying rules apply in this case." Id. at 800.

SNE argues here that the court's ruling in Grappone necessarily precludes the dealers' claims that SNE has market power in the market for Subaru vehicles. Certainly nothing in the dealers' complaint suggests that SNE's share of the New England automobile market has grown from minuscule to dominant since the First Circuit's decision in Grappone. Accordingly, I agree that Grappone dictates that the dealers in this case cannot successfully plead a traditional per se tying violation. This conclusion does not, however, necessarily doom the dealers' claim because they base their right to recovery on the Supreme Court's more recent analysis of the issue in Eastman Kodak Company v. Image Technical Services, Inc., 504 U.S. 451 (1992).

Kodak provides antitrust plaintiffs with a framework for bringing a per se tying claim in cases where a plaintiff argues that the defendant has substantial market power in a product aftermarket even though it lacks power in the market for the primary product. Kodak manufactured and sold photocopiers and micrographic equipment. See 504 U.S. at 455, 456. It also sold two aftermarket products related to the equipment: replacement parts and service. See id. at 455, 457. After many customers had already purchased Kodak equipment, numerous independent service organizations (ISOs) began to offer service for the

-8-

machines at a lower price than that charged by Kodak.  See id. at 455, 457.  Kodak reacted by tying the availability of Kodak replacement parts, which were the only parts that could be used in servicing the machines, to the purchase of service from Kodak. See id. at 457, 458.  As a result, the ISOs were no longer able to compete with Kodak in the market for equipment servicing.  See id. at 458.

A group of ISOs sued Kodak, claiming, inter alia, that Kodak had tied the sale of service to the sale of replacement parts, in violation of § 1 of the Sherman Act.  See id. at 459.  In response, Kodak insisted that it was entitled to judgment as a matter of law because the existence of competition in the market for equipment, which was conceded, necessarily meant that there must be competition in the derivative aftermarket for replacement parts.  See id. at 465-66.  Therefore, Kodak argued, it lacked sufficient power over the market for replacement parts (the "tying product") to commit a per se tying violation.  See id. Kodak's proposed legal rule -- that "equipment competition precludes any finding of monopoly power in derivative aftermarkets," id. at 466 (internal quotation marks omitted) -- stemmed from an assumption about the perfect operation of the "cross-elasticity of demand" between the primary equipment market

and the derivative aftermarkets.  Id. at 469 (internal quotation marks omitted).

The Court rejected Kodak's contention, concluding instead that "there is no immutable physical law -- no 'basic economic reality' -- insisting that competition in the equipment market cannot coexist with market power in the aftermarkets."  Id. at 471.  Rather, the court held that the ISOs were entitled to the opportunity to prove that two factors -- "information costs" and "switching costs" -- "foil[ed] the simple assumption that the equipment and service markets act as pure complements to one another."  Id. at 477.  The Court determined that information costs could undermine the "cross-elasticity of demand" between the equipment market and derivative aftermarkets if consumers who purchased Kodak equipment lacked the information necessary to calculate the total "life-cycle" cost of the equipment, including the cost of tied parts and service, at the time that they decided which manufacturer's machines to purchase.  See id. at 473-76.  The Court also reasoned that consumers who purchased Kodak equipment might be willing to pay supra-competitive prices for Kodak service (the tied product) in order to get the replacement parts (the tying product) they needed to maintain their original investment in the equipment (the "lock-in product"), particularly

-10-

if their only alternative was to switch to another manufacturer's machines and thereby abandon the substantial investment already made in the Kodak equipment. See id. at 476-77.

The First Circuit applied the Kodak framework in the context of a Rule 12(b)(6) motion in Lee v. Life Insurance Company of North America, 23 F.3d 14 (1st Cir. 1994). In Lee, the plaintiffs were University of Rhode Island (URI) students who brought antitrust and other claims against the university, university officials, and the university's student-health insurer. See id. at 15. The crux of the students' antitrust claim was that URI had committed unlawful tying in violation of §1 of the Sherman Act by requiring all full-time undergraduate students to pay a health-services fee and to carry supplemental health insurance. See id. at 15-16. Among various tying theories, the students advanced a Kodak "lock-in" claim in which first semester matriculation at URI was identified as the "lock-in product," subsequent semesters at URI were the "tying product," and the health-services fee and supplemental insurance coverage were the "tied product." See id. at 18.

The First Circuit assumed that Kodak potentially applied to the students' tying claim but ultimately rejected the claim because the students failed to allege either the information

costs or the switching costs discussed by the Supreme Court in Kodak. The students were unable to allege information costs, according to the court, because it was evident that prior to enrolling at URI, students were informed that continued enrollment was conditioned on paying the health-services fee and obtaining supplemental insurance. See id. at 19. The court found that the students "made no allegations sufficient to give rise to a reasonable inference that the health-care and insurance-cost information needed to make an informed decision whether to accept the preconditions to continued matriculation at URI is either difficult or expensive to obtain or correlate." Id. (emphasis in original). The court also observed that the students failed to plead the switching costs necessary for a "lock-in," i.e., they failed to allege "actual costs associated with switching from URI after their first semester." Id. The court emphasized that "the timing of the 'lock-in' at issue in Kodak was central to the Supreme Court's decision," id. at 20 (emphasis in original), and noted that the students could not mirror the claim in Kodak that the tying arrangement was instituted only after many customers had already purchased the equipment and then applied retroactively to the "locked-in"

-12-

customers.  See id.[8]  Finally, the court distinguished the context of its case from Kodak by pointing out that the students' claims did not involve a "derivative aftermarket" or "complex durable goods."  Id. at 19-20.

Accepting all of the allegations pleaded in the dealers' complaint as true and drawing all reasonable inferences in their favor, I conclude that the dealers have stated a cognizable tying claim under Kodak.  In the present case, the "lock-in products" are the Subaru franchises (analogous to the Kodak equipment), the "tying products" are the Subaru vehicles (analogous to the Kodak replacement parts), and the "tied products" are the accessories (analogous to the Kodak service).  The dealers' complaint, unlike the students' complaint in Lee, includes allegations of information costs, switching costs, and the timing of the "lock-in" effect that bring it within the framework created by Kodak.

_____

[8]  Other Circuits have agreed with the First Circuit that the timing of the tying arrangement was crucial to the result in Kodak.  See, e.g., PSI Repair Servs., Inc. v. Honeywell, Inc., 104 F.3d 811, 820 (6th Cir.) (holding that "an antitrust plaintiff cannot succeed on a Kodak-type theory when the defendant has not changed its policy after locking-in some of its customers"), cert. denied, 520 U.S. 1265 (1997); Digital Equip. Corp. v. Uniq Digital Techs., Inc., 73 F.3d 756, 763 (7th Cir. 1996) (stating that "the Court in Kodak did not doubt that if spare parts had been bundled with Kodak's copiers from the outset, or Kodak had informed customers about its policies before they bought its machines, purchasers could have shopped around for competitive life-cycle prices").

-13-

Moreover, unlike the students' claim in Lee, the dealers' claim arises in the context of derivative aftermarkets in complex durable goods, e.g., automobiles and automobile accessories.

The dealers have adequately alleged that they did not have access to the information necessary to accurately assess the life-cycle cost of their dealership franchises, including the actual cost of vehicles and accessories, because Subaru of New England concealed the tying arrangement until after they became locked into their dealerships. See First Am. Compl. (Doc. #31) ¶ 147 at 43. Without the knowledge that they would be required to purchase accessories as a condition of obtaining discretionary vehicles, the dealers could not have accurately calculated the costs of a franchise at the time that they were deciding whether to sign dealership agreements with Subaru of New England.[9]

The dealers have also alleged the timing and switching costs necessary to give rise to a "lock-in" tying claim. The dealers

_____

[9] In Lee, the First Circuit noted that the students did not "suggest that URI had any incentive to conceal the scope of past . . . increases" in the health-services fee and the cost of supplemental insurance. Lee, 23 F.3d at 19 n.10. In the present case, by contrast, the dealers have alleged that Subaru of New England had a strong economic incentive to conceal (and did in fact conceal) the tying arrangement -- and thus the true cost of a Subaru dealership franchise -- until after the dealers had signed their agreements. See First Am. Compl. (Doc. #31) ¶¶ 147, 150, 153 at 43, 44, 45.

claim that they did not discover the tie between discretionary vehicles and accessories until after they were "'locked in' (financially committed) to the franchise relationship." Id. ¶ 147 at 43. While this allegation is general in nature, it provides a sufficient basis for inferring that the tying arrangement was instituted only after a significant number of dealers had signed agreements with Subaru of New England. It also supports an inference that the dealers could not abandon their franchises and switch to another automobile manufacturer without accruing significant costs and losing their substantial investments in the franchises. Further, the complaint alleges that SNE has succeeded in exploiting its power in the tying product to foreclose sales in the tied product by competing suppliers. See id. ¶ 149 at 44. These allegations are sufficient to support a per se tying claim under Kodak.

This reasoning is consistent not only with Kodak and Lee, but also with the opinions of other federal courts considering analogous claims. In the years since the Supreme Court decided Kodak, federal courts have entertained a spate of Kodak-based tying claims. Some of these claims have been dismissed, either for failure to state a claim or on summary judgment, due to the plaintiffs' failure to provide factual allegations or produce

evidence of information and switching costs.[10] However, in other cases where the plaintiffs have alleged or produced admissible evidence of substantial information costs, switching costs, and the timing necessary to create a "lock-in effect," courts have recognized a cognizable claim under Kodak.[11]

---

[10] See, e.g., Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 440, 441 (3d Cir. 1997) (affirming dismissal of plaintiffs' Kodak-based tying claim where tying arrangement was spelled out in franchise agreement, and thus life-cycle cost information was available to plaintiffs before they were "locked-in"), cert. denied, 118 S.Ct. 1385 (1998); United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exchange, 89 F.3d 233, 237-39 (5th Cir. 1996) (affirming grant of summary judgment to defendant where plaintiffs failed to produce evidence of significant information or switching costs), cert. denied, 519 U.S. 1116 (1997).

[11] See, e.g., Virtual Maintenance, Inc. v. Prime Computer, Inc., 11 F.3d 660, 666-67 (6th Cir. 1993) (holding that plaintiff had stated valid tying claim under Kodak by producing, among other evidence, expert testimony concerning lock-in and switching costs); Red Lion Med. Safety, Inc. v. Ohmeda, Inc., 63 F. Supp.2d 1218, 1232 (E.D. Ca. 1999) (denying defendant's motion for summary judgment on plaintiff's Kodak-based tying claim because plaintiffs presented sufficient evidence of information costs and "lock-in"); Subsolutions, Inc. v. Doctor's Assocs., Inc., 62 F. Supp. 616, 626 (D. Conn. 1999) (concluding that plaintiff franchisees had stated a Kodak lock-in claim based on factual allegations relating to information costs and timing); Collins v. Int'l Dairy Queen, Inc., 939 F. Supp. 875, 883 (M.D. Ga. 1996) (denying summary judgment to defendants because, inter alia, plaintiff-franchisees had produced evidence of switching costs and resultant lock-in effect); Wilson v. Mobil Oil Corp., 940 F. Supp. 944, 947-48, 953-54 (E.D. La. 1996) (denying motion to dismiss and concluding that plaintiff-franchisees had stated a Kodak lock-in claim based on allegations of information and switching costs).

SNE implicitly challenges the applicability of <u>Kodak</u> and <u>Lee</u> to most franchise tying claims where the tying product is not unique. Although it confines its argument on this point to a single footnote in a 25-page memorandum, <u>see</u> Def. Subaru of New England, Inc.'s Mot. to Dismiss (Doc. #34) at 17 n.12, SNE appears to assert that a franchisor cannot be deemed to have achieved market power in a market for a tying product with otherwise interchangeable substitutes by concealing the tying arrangement from the franchisees until after it has locked the franchisees into contractual commitments and substantial "sunk" costs. Instead, SNE suggests that a seller may achieve power in a tying product market in such circumstances only if the tying product is unique.

I decline to address this difficult argument at the present time because it has not been adequately briefed. While there is some support for SNE's position in both the case law[12] and the academic literature,[13] contrary views also abound.[14] Moreover, it

---

[12] <u>See</u> <u>Queen City Pizza, Inc. v. Domino's Pizza, Inc.</u>, 124 F.3d 430, 440-41 (3rd Cir. 1997); <u>United Farmers Agents Ass'n v. Farmers Ins. Exchange</u>, 89 F.3d 233, 236-37 (5th Cir. 1996); <u>Chawla v. Shell Oil Co.</u>, --- F. Supp.2d ---, No. Civ. A. H-99-1711, 1999 WL 1081002, at *10-12 (S.D. Tex. Nov. 3, 1999).

[13] <u>See</u> P. Areeda and H. Hovencamp, <u>Antitrust Law</u>, ¶ 510b at 111 (Supp. 1998); T. Lin, <u>Distinguishing Kodak Lock-In and Franchise Contractual Lock-In</u>, 23 S. Ill. U. L.J. 87, 120 (1998);

is difficult to reconcile SNE's position with the First Circuit's opinion in Lee, which assumes that the existence of substantial information and switching costs can give a seller power in the market for an otherwise interchangeable tying product.  See 23 F.3d at 18.  In light of the complexity of this issue and SNE's failure to properly brief it, I decline to address the merits of the argument.[15]

SNE also asserts that the dealers' tying claim must be dismissed even if SNE was able to lock the dealers into their franchises before disclosing the tying arrangement because it imposed the arrangement on only 10% of the vehicles it released into the New England market.  I reject this argument.  If the dealers have correctly characterized the tying product market as the market for new Subaru vehicles, it is undisputed that SNE has a monopoly in the New England market.  The fact that it has been

_____

A. Silberman, The Myths of Franchise Market Power, 65 Antitrust L.J. 181 (1996).

[14] See cases cited at note 11; B. Klein, Market Power in Franchise Cases in the Wake of Kodak: Applying Post-Contract Hold-Up Analysis to Vertical Relationships, 67 Antitrust L.J. 283 (1999); W. Grimes, Market Definition in Franchise Antitrust Claims: Relational Market Power and the Franchisor's Conflict of Interest, 67 Antitrust L.J. 243 (1999).

[15] SNE may renew its argument later in a properly supported motion for summary judgment.

-18-

successful in exploiting that monopoly to foreclose substantial commerce in the automobile accessories market by imposing the tying arrangement on only 10% of its vehicles is hardly a viable defense to the dealers' claim.

## III.

The dealers have stated a cognizable per se tying claim under the Kodak framework.  Accordingly, SNE's motion to dismiss the dealers' antitrust claim is denied.


SO ORDERED.


_____
Paul Barbadoro
Chief Judge


December 13,  1999

cc:  Richard McNamara, Esq.
     Michael Harvell, Esq.
     Howard Cooper, Esq.
     William Kershaw, Esq.
     Robert Cordy, Esq.