**Elisha D. HACK, et al., Plaintiffs,**

v.

**THE PRESIDENT AND FELLOWS OF YALE COLLEGE d/b/a Yale Corporation and Yale University, et al., Defendants.**

**No. CIV. 3:97CV02212 (AVC).**

United States District Court,
D. Connecticut.

July 31, 1998.

William F. Gallagher, Barbara L. Cox, Gallagher, Gallagher & Calistro, New Haven, CT, Nathan Lewin, Richard W. Garnett, Miller, Cassidy, Larroca & Lewin, Washington, DC, for Elisha D. Hack, Jeremy A. Hershman, Batsheva Greer, Lisa B. Friedman, plaintiffs.

James Sicilian, Felix J. Springer, William D. Thompson, Jr., Day, Berry & Howard, Hartford, CT, for Yale College, President & Fellows dba Yale Corp, Yale University, Richard H. Brodhead, Betty Trachtenberg, defendants.

### *RULING ON THE DEFENDANTS' MOTION TO DISMISS*

COVELLO, Chief Judge.

This is an action for damages and injunctive relief in which the plaintiffs, who are freshmen and sophomores at Yale College, claim that the defendants have discriminatorily denied them permission to reside off campus. Specifically, the plaintiffs claim that: 1) the defendants violated the First, Fourth, and Fourteenth Amendments to the United States Constitution by interfering with their free exercise of religion; the plaintiffs claim relief under 42 U.S.C. § 1983; 2) the defendants violated the federal Fair Housing Act, 42 U.S.C. § 3604; 3) the defendants violated the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2; and 4) the defendants are liable under common law tenets concerning breach of contract and unjust enrichment.

The defendants have now filed the within motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), on the ground that the complaint has failed to state a claim upon which relief can be granted. The issues presented are: 1) whether the implementation of Yale's housing policy constitutes action under color of state law; 2) whether Yale's housing policy decision to deny the plaintiffs' request to live off campus constitutes a violation the federal Fair Housing Act; 3) whether Yale's housing policy constitutes an illegal tying arrangement under the Sherman Antitrust Act; 4) whether Yale's housing policy constitutes a monopoly power in a relevant market under the Sherman Antitrust Act; 5) whether the implementation of Yale's housing policy constitutes a breach of contract due to Yale's alleged failure to accommodate the plaintiffs' bona fide religious convictions; and 6) whether the implementation of Yale's housing policy constitutes unjust enrichment.

For the reasons hereinafter set forth, the court concludes that: 1) the administrators of Yale College did not act under color of state law when they denied the plaintiffs' request to reside off campus; 2) the plaintiffs lack standing to claim a violation of the federal Fair Housing Act; 3) the amended complaint has not sufficiently alleged that Yale has the requisite market power in the tying market to state a claim of an illegal tying arrangement; 4) the amended complaint has not sufficiently alleged a relevant market necessary to state a claim of an illegal monopoly; and 5) the court declines to exercise pendent jurisdiction over the state law claims of breach of contract and unjust enrichment. Accordingly, the defendants' motion to dismiss (document no. 11) is hereby GRANTED.

### *FACTS*

The amended complaint alleges the following. The plaintiffs, Elisha D. Hack, Jeremy A. Hershman, Batsheva Greer, and Lisa B. Friedman, are freshman and sophomore students at Yale College. The plaintiffs assert that the defendants, The President and Fellows of Yale College d/b/a Yale Corporation and Yale University, Richard H. Brodhead, and Betty Trachtenberg (hereinafter "Yale"), discriminated against them because of their religion when the defendants denied the plaintiffs' request to reside off campus.

The residence halls at Yale College are coeducational and the college does not operate single-sex residence halls. Yale's "Dormitory Regulations" provide that "[a]ll freshmen and sophomores are required to live on campus, except freshmen who are married or who are over twenty-one years of age." A freshman or sophomore who is married or twenty-one years or older may request an exemption from the on campus requirement. Students who are accepted to and enroll in the undergraduate degree program at Yale College must comply with the housing policy.

At the time the plaintiffs filed the amended complaint, each of them was younger than twenty-one years of age and not married. The plaintiffs are Orthodox Jews "whose religious beliefs and obligations regarding sexual modesty forbid them to reside in the co-

educational housing provided and mandated by Yale."

In April 1995, admissions officials admitted Friedman to Yale College. She deferred enrollment until the Fall of 1996. In April 1996, she wrote a letter to Yale requesting an exemption from the housing requirement based on her religious beliefs and obligations. Yale denied her request.[1] In April 1995, admissions officials admitted Hershman to Yale College. He deferred enrollment until the Fall of 1996. On March 18, 1996 he requested an exemption from Yale's dormitory regulations based on his religious beliefs and obligations. In April 1995, admissions officials admitted Hack to Yale College. He deferred enrollment for two years until the Fall of 1997. On May 9, 1997, Hack requested an exemption from the housing requirement based on his religious beliefs and obligations. Finally, in April 1996, admissions officials admitted Greer to Yale College, but she deferred enrollment until the Fall of 1997. She requested an exemption from Yale's housing policy based on her religious beliefs and obligations. Yale denied all of the plaintiffs' exemption requests and required them to live on campus in the co-educational residence halls.

Yale charged the plaintiffs for the residence hall fee, which the plaintiffs paid. The residence hall rooms remain vacant for the plaintiffs' return. All of the plaintiffs have elected, however, to reside off campus in housing "that provides ... an appropriate environment in which to practice [their] faith."

#### STANDARD

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) involves a determination as to whether the plaintiff has stated a claim upon which relief may be granted. *Fischman v. Blue Cross Blue Shield,* 755 F.Supp. 528 (D.Conn.1990). The motion must be decided solely on the facts alleged. *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985). A court must assume all factual allegations in

the complaint to be true and must draw reasonable inferences in favor of the non-moving party. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Such a motion should be granted only when no set of facts consistent with the allegations could be proven which would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The issue is not whether the plaintiff will prevail, but whether he should have the opportunity to prove his claims. *Id.*

#### DISCUSSION

##### I. § 1983 Claims

Yale argues that the "first four counts [in the amended complaint] ... all fail to state a claim because Yale is not an entity acting 'under color of state law' for purposes of [42 U.S.C.] § 1983." Specifically, Yale argues that it is not a state actor and that its conduct cannot be deemed state action.

The plaintiffs first respond that a determination of whether Yale is a state actor or whether Yale's conduct can be fairly attributed to the State of Connecticut "will require careful analysis of the particular facts in this case." Moreover, the plaintiffs contend that "these claims should not be dismissed before the plaintiffs have had an opportunity to engage in the discovery to which they are entitled and to introduce supporting evidence."

Second, "the plaintiffs initial 'state action' theory is that Yale will, after discovery and a presentation of the evidence, be shown to be a 'Government entity' under *Lebron.*"

Third, the plaintiffs respond that the state action inquiry is fact based and that "[t]here is no 'unitary test' [to] determin[e]" whether conduct should be attributed to the state. The plaintiffs argue that "the facts of each case [should] determine the test."

Section 1983 provides that no person acting "under color of any statute ... of any State" shall deprive another of any right,

---

1. The amended complaint alleges that Yale's denial letter explained the following:

   " 'Yale will continue the practice of working with the students to accommodate their reli-

gious practices.' [Dean Trachtenberg] did not deem Ms. Friedman's own sincere religious practices to be a sufficient reason to depart from Yale's housing regulations."

privilege or immunity "secured by the Constitution and the laws" of the United States. 42 U.S.C. § 1983. A plaintiff may bring a claim "under § 1983 only if the defendant acted 'under color' of state law." *Rendell–Baker v. Kohn*, 457 U.S. 830, 835, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). An entity can be deemed to have acted 'under color' of state law either under the state actor analysis or the state action analysis.

## A. State Actor

■ Yale first argues that it is not a state actor for § 1983 purposes. Yale, relying on *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902(1995), posits that the amended complaint has failed to satisfy the third prong of a three-pronged analytical test, which determines whether an entity is a state actor. Specifically, Yale contends that "the plaintiffs have not alleged ... that the State of Connecticut has retained permanent authority to appoint a majority of the members of the Yale Corporation or any governing body at Yale University."

The plaintiffs respond that "Yale asks this Court to extract from *Lebron's* fact-intensive inquiry a 'three-pronged' formula that would limit *Lebron's* reasoning to the particular facts of that case." The plaintiffs assert that "[t]he Court in *Lebron* did *not* hold that state-action analysis hinges on the number of directors who are public officials or who are appointed by public officials." The plaintiffs further respond that "the [first] two factors relied on in *Lebron* are indisputably present in this case. . . ."

In *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995), the plaintiff sued Amtrak because its vice president, in accordance with an Amtrak policy, refused to grant the plaintiff's request to post a political advertisement on a large billboard located in Penn Station. *Id.* at 376, 115 S.Ct. 961. Lebron claimed that the vice president's refusal violated his First and Fifth Amendment rights. *Id.* at 377, 115 S.Ct. 961. The District Court for the Southern District of New York concluded that Amtrak was a government actor because it maintained "close ties to the Federal Government." *Id.* The Court of Appeals for the Second Circuit reversed and concluded that a congressional act created Amtrak wherein Congress specifically stated that Amtrak was not a government entity. *Id.* at 378, 115 S.Ct. 961.

■ The Supreme Court's inquiry in *Lebron* focused on whether Amtrak was a "[g]overnment-created and controlled corporatio[n]." *Id.* at 394, 395–400, 115 S.Ct. 961. In determining whether Amtrak was a government actor, the Supreme Court developed a three-pronged analytical test:

where. . . [1] the Government creates a corporation by special law, [2] for the furtherance of government objectives, and [3] retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment.

*Id.* at 400, 115 S.Ct. 961.

In order for an entity to be deemed a state actor each of the three prongs must be satisfied. *See, e.g., Barrios–Velazquez v. Asociacion De Empleados Del Estado Libre Asociado De Puerto Rico* (AEELA), 84 F.3d 487, 491–92 (1st Cir.1996) (holding that because the government of Puerto Rico did not appoint any directors to AEELA'S board, the plaintiffs failed to satisfy the third prong of the *Lebron* test; therefore AEELA was not a government actor); *See also Hall v. American Nat'l Red Cross*, 86 F.3d 919, 921–22 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 516, 136 L.Ed.2d 404 (1996)(holding that because the President of the United States appointed only eight out of the fifty members who sat on the Red Cross' Board of Governors, the plaintiff failed to satisfy the third prong of the *Lebron* test; therefore the Red Cross was not a government actor).

Based on the foregoing, the court concludes that a complaint must allege facts to support all three prongs of the *Lebron* test to establish that a party is a state actor within the meaning of § 1983.

In their motion to dismiss, Yale only argues that the amended complaint fails to sufficiently allege facts with respect the third

prong in *Lebron*, therefore, the court limits its discussion to that issue alone.

The third prong of the *Lebron* test requires that the government retain for itself the permanent authority to appoint a majority of the directors of a corporation in order for the corporation to be deemed a state actor.[2]

Yale argues specifically that "the plaintiffs have not alleged ... that the State of Connecticut has retained permanent authority to appoint a majority of the members of the Yale Corporation or any governing body at Yale University."

The plaintiffs respond "[t]he Court in *Lebron* did *not* hold that state-action analysis hinges on the number of directors who are public officials or who are appointed by public officials."

The amended complaint alleges that "by designating the Governor and Lieutenant Governor as *ex officio* Fellows [of Yale College], the State of Connecticut treats Yale as a state actor."

Yale's governing body is comprised of nineteen members. The Governor and Lieutenant Governor, as *ex officio* members, constitute only two of the nineteen members. The State of Connecticut, therefore, does not retain the authority to appoint a *majority* of directors of Yale Corporation.[3] *See, e.g., Barrios–Velazquez v. Asociacion De Empleados Del Estado Libre Asociado De Puerto Rico* (AEELA), 84 F.3d 487 (1st Cir.1996); *Hall v. American Nat'l Red Cross*, 86 F.3d 919, 921–22 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 516, 136 L.Ed.2d 404

(1996); *Abu–Jamal v. National Pub. Radio,* No. 96–0594, 1997 WL 527349, *4, 1997 U.S. Dist. LEXIS 13604, at *10 (D.D.C. Aug. 21, 1997) (rejecting the allegation that NPR was a state actor because the government did not appoint any directors to its governing board).

The plaintiffs rely on *Krynicky v. University of Pittsburgh*, 742 F.2d 94 (3d Cir.1984), in which the Third Circuit concluded that the University of Pittsburgh was a state actor. The plaintiffs, in opposing the within motion, argue that the university was a state actor because "*inter alia,* several government officials were *ex officio* trustees and the state appointed *one-third* of the trustees." The Third Circuit did not arrive, however, at its conclusion based solely on allegations of *ex officio* and state-appointed trustee membership. Instead, the court concluded that a legislative act "establish[ed the] University of Pittsburgh as an *instrumentality* of the Commonwealth to serve as a State-related institution in the Commonwealth System of higher education." *Id.* at 102 (emphasis in original).[4]

By failing to allege that the State of Connecticut retains permanent authority to appoint a majority of the members to Yale's governing board, the amended complaint fails to satisfy the third prong of the *Lebron* test. The court concludes that because the amended complaint does not satisfy each prong of the *Lebron* test, Yale cannot be considered a state actor.

**B.** *State Action*

■ The defendants argue that "the plaintiffs apparently refrain from making an alter-

---

**2.** *See, e.g., Abu–Jamal v. National Pub. Radio,* No. 96–0594, 1997 WL 527349, *4, 1997 U.S. Dist. LEXIS 13604, at *10 (D.D.C. Aug. 21, 1997)("[I]n addition to government creation to further governmental purposes, there must be government *control...* [which] is achieved when the government commandeers the board of directors." (emphasis added)).

**3.** *See Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 385, 115 S.Ct. 961, 130 L.Ed.2d 902 (the President appoints six of nine members to sit on Amtrak's board of directors as follows: 1) the Secretary of Transportation, or his designee sits *ex officio;* 2) three directors are appointed with the advice and consent of the Senate; 3) two are chosen without Senate involvement. (Of

the remaining three, two are chosen by the Secretary of Transportation, and the third is elected by the other eight directors and is Amtrak's president.)).

**4.** The plaintiffs also rely on *Isaacs v. Board of Trustees of Temple Univ.-of the Commonwealth Sys. of Higher Educ.*, 385 F.Supp. 473 (E.D.Pa. 1974). In *Isaacs*, the court concluded that Temple University was a state actor. Specifically, a legislative act had "profoundly altered the relationship between Temple and the Commonwealth ... [whereby] the act designated Temple as an instrumentality of the commonwealth [and] incorporated it as a state-related institution." *Id.* at 478.

native claim for state action under the pre-*Lebron* analysis." Nevertheless, the defendants argue that even if the plaintiffs were to argue that Yale's conduct is state action, "the United States Supreme Court has already rejected such an argument [in *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) ]."

First, Yale argues that the amended complaint has failed to allege that the state, through regulation or policy, "compelled or significantly encouraged Yale's decision to enact" its housing policy. Moreover, Yale contends that "constitutional confirmation of Yale's charter does nothing to establish that the state controls Yale." Yale further argues that the "state has continually diminished its role with regard to Yale's governing board" such that today only the Governor and Lieutenant Governor are board members by virtue of their respective offices.

Second, Yale argues that the allegations in the amended complaint concerning appropriations of public funds to Yale by the state of Connecticut are mostly historical. Specifically, Yale contends that the amended complaint has not alleged that Yale has received public funds from the state of Connecticut from 1882 to the present day.

The plaintiffs respond that "a variety of facts establish[ ] that Yale's housing policy is state action for purposes of § 1983 because of the unique nature of the relationship between Yale and the government. All of these facts tend to show that Yale is a state actor and its housing policy is state action for § 1983 purposes."

■ State action may be present when the state and a private entity are so closely connected that the action of the private entity "may be fairly treated as the state itself." *Blum, Comm'r of the New York State Dep't of Soc. Servs. v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). The underlying purpose of attributing state action to private activity is "to assure that constitutional standards are invoked only when it can be said that the state is *responsible* for the

specific conduct of which the plaintiff complains." *Id.* (emphasis in original).

■ The Supreme Court has developed four principles to analyze claims of state action. Specifically, the principles are (1) whether there exists a "symbiotic relationship" between the entity and the state; (2) whether there is "extensive regulation" of the entity by the state; (3) whether the entity "depended on the State for funds"; and (4) whether the entity "performs a public function." *Rendell–Baker*, 457 U.S. 830, 840–42, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

### 1. *Yale's Relationship with and Regulation by the State*

■ In order for private conduct to be fairly treated as the state itself, the state must have "exercised coercive power or ha[ve] provided such significant encouragement, either overt or covert, that the choice [of the private actor] must in law be deemed to be that of the state." *Blum*, 457 U.S. at 1004, 102 S.Ct. 2777.

In *Rendell–Baker*, the Supreme Court held that personnel decisions made by the director of a private school could not be fairly attributed to the state. *See Rendell–Baker*, 457 U.S. at 841–43, 102 S.Ct. 2764. The school was a private institution for maladjusted high school students, which was regulated by Massachusetts' statutes.[5] The Court explained that "[t]he most intrusive ... regulation promulgated by the various government agencies was the requirement that the Committee on Criminal Justice had the power to approve persons hired as vocational counselors at the school." *Id.* at 841–42, 102 S.Ct. 2764.

Despite the state's financial assistance to and regulation of the school, the Court held that the state of Massachusetts did not compel or influence the decisions to discharge the faculty members. Moreover, Justice White explained that a critical factor in finding no state action "[wa]s the absence of any

---

5. *See Rendell–Baker*, 457 U.S. at 832 n. 1, 102 S.Ct. 2764 ("Chapter 766, 1972 Mass. Acts, Mass. Gen. Laws Ann., ch. 71B § 3 (West Supp. 1981)." The statutes provide regulations, in rele-

vant part, for school-related matters including: record-keeping, student-teacher ratios, written personnel standards and procedures, etc. *See Rendell–Baker*, 457 U.S. at 833, 102 S.Ct. 2764.

allegation that the employment decision was itself based upon some rule of conduct or policy put forth by the State." *Rendell–Baker*, 457 U.S. at 844, 102 S.Ct. 2764 (White, J., concurring).

In the present case, the amended complaint does not allege that the State of Connecticut, either through a regulation or policy, exercised coercive power or significantly encouraged Yale to adopt its housing policy or to render specific housing decisions. At most, the amended complaint alleges that two state officials sit, merely by virtue of their office, on Yale's governing board and that Yale has a "300–year history of partnership with the Colony and State of Connecticut...."

Similar to the complaint in *Blum*, 457 U.S. 991, 102 S.Ct. 2777, the amended complaint "seeks to hold state officials liable for the actions of private parties...." *Id.* at 1003, 102 S.Ct. 2777 (holding that although the state regulated and subsidized the nursing homes, private parties, not state officials, made the administrative decisions; therefore the decisions could not be treated as state action.). These allegations alone, however, do not suffice to make Yale's conduct attributable to the state.

### 2. *Public Funds Appropriated to Yale*

In *Rendell–Baker*, 457 U.S. 830, 102 S.Ct. 2764, the state appropriated funds to the school, which at times accounted for 90–99% of the school's budget. *Id.* at 832, 102 S.Ct. 2764. The court concluded that "the school's receipt of public funds do not make the discharge decisions acts of the State." *Id.* at 840, 102 S.Ct. 2764; *see also Blum*, 457 U.S. at 1011, 102 S.Ct. 2777 (although the state subsidized operating costs for the nursing homes and paid medical expenses for more than 90% of the homes' patients, the state funding did not transform the private conduct into state action).[6]

The amended complaint alleges that Yale receives "continued financial and other support provided by the governments of New Haven, Connecticut, and the United States." Notwithstanding the fact that the amended complaint fails to allege the amount of financial support Yale has received, in *Rendell–Baker*, 457 U.S. 830, 102 S.Ct. 2764, the Supreme Court held that although a school received between 90% and 99% of its operating costs from the government, the school director's conduct was not state action. *Id.* at 832, 102 S.Ct. 2764. Consequently, the allegation that Yale received some financial support from the state is insufficient to establish that Yale's conduct is state action.

### 3. *Yale's Conduct under Public Function Analysis.*

For a private entity's conduct to rise to the level of state action under the public function analysis, the Supreme Court has held that "the question is whether the function performed has been traditionally the *exclusive* prerogative of the state." *Id.* at 842, 102 S.Ct. 2764 (internal quotations and citations omitted). Furthermore, the Court explained that its "holdings have made clear that the relevant question is not simply whether a private group is serving a public function." *Rendell–Baker*, 457 U.S. at 842, 102 S.Ct. 2764. Specifically, the Court explained, "that [although] a private entity [may] perform[ ] a public function which serves the public [that] does not make its acts state action." *Id.*

On at least three occasions, the Supreme Court has analyzed state action under the public function analysis. In *Rendell–Baker*, the Court held that although the private high school for maladjusted students served the public, it did not perform functions that were traditionally the exclusive prerogative of the state. *Id.*

Similarly in *Blum*, 457 U.S. 991, 102 S.Ct. 2777, the Court held that nursing homes' provision of medical care for Medicaid patients was not a public function that was traditionally within the exclusive province of the state. *Id.* at 1011, 102 S.Ct. 2777. The Court explained that "it would not follow that the decisions made in the day-to-day admin-

---

**6.** *See also Cohen v. President and Fellows of Harvard College,* 568 F.Supp. 658, 660 (D.Mass.1983) ("[T]he receipt of government funds does not render the government responsible for a private entity's decisions concerning the use of those funds.")(quoting *Gerena v. Puerto Rico Legal Servs.,* 697 F.2d 447, 450 (1st Cir.1983).

istration of a nursing home are the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public." *Id.* at 1012, 102 S.Ct. 2777.

Finally, in *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987), the Court held that conduct by the United States Olympic Committee did not rise to the level of state action under the public function analysis. Specifically, the Court explained that "the activities performed by the USOC [United States Olympic Committee] serve[d] a national interest. . . . [However,] [n]either the conduct nor the coordination of amateur sports has been a traditional governmental function." *San Francisco Arts & Athletics, Inc.,* 483 U.S. at 544–45, 107 S.Ct. 2971.

The amended complaint alleges that the State of Connecticut has "held Yale out to the public as performing public functions for the benefit of the state." The court does not disagree that Yale serves the public and that this service may benefit the State of Connecticut. This, however, is not sufficient to establish that Yale's conduct is state action under the public function analysis. Following *Rendell–Baker* and *Blum,* the court concludes that Yale's housing policy decisions cannot be fairly attributed to the State of Connecticut merely because Yale "provid[es] quality education at the college and graduate level" that may benefit the state.

Therefore, having found that: 1) Yale is not a state actor; and 2) Yale's housing policy decisions may not be treated as state action, the court concludes that Yale did not act under color of state within the meaning of 42 U.S.C. § 1983. Consequently, counts one, two, three, four, and ten, as set forth in the amended complaint are hereby dismissed.

## II. *Federal Fair Housing Act Claims*

Yale next argues that the amended complaint has not established a cause of action under the federal Fair Housing Act, 42 U.S.C. § 3604. Specifically, Yale argues that

it has provided rooms for the plaintiffs in the residence halls, and the rooms remain vacant for the plaintiffs' return.

In addition, Yale argues that the federal Fair Housing Act does not create a duty in the defendants to reasonably accommodate the plaintiffs' religious beliefs. Specifically, Yale contends that "Section 3604(f), concerning handicapped individuals, is the only part of the FHA that requires 'reasonable accommodations' or 'reasonable modifications of existing premises'." Yale contends that this section does not apply to the plaintiffs because the amended complaint does not allege that the plaintiffs are handicapped.

The plaintiffs respond "that Yale has discriminated against them 'because of religion' by requiring students to live in co-educational housing, by treating their religious-based exemptions from co-educational housing differently from other requests, and by exempting students from the on-campus housing requirement for non-religious reasons while refusing to exempt those who have invoked religious reasons." The plaintiffs further respond that "providing co-educational housing to all students does not defeat the plaintiffs'. . . claim . . . because [co-educational] housing, in and of itself, violates the students' religious convictions." The plaintiffs contend that "this is true *even if* Yale were not required, as an initial matter, to 'accommodate' the plaintiffs in the same way it would be required to accommodate a physical handicap."

The federal Fair Housing Act provides, in part, that "it shall be unlawful to refuse to sell or rent . . . or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a).

■ The federal Fair Housing Act confers statutory standing to challenge discriminatory practices on any "aggrieved person." 42 U.S.C. § 3613(a)(1)(A).[7] To establish that a

7. "An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged

discriminatory housing practice, or the breach of a conciliation agreement entered into under this subchapter, whichever occurs last, to obtain appropriate relief with respect to such discrimina-

plaintiff is an aggrieved person under the Act, "a private plaintiff [must] allege injury in fact within the meaning of Article III of the [United States] Constitution, that is, that he allege distinct and palpable injuries that are fairly traceable to [the] defendants' actions." *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412 (2d Cir.1995).

The plaintiff "invoking federal jurisdiction bears the burden of establishing the[ ] elements [of standing]." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The Supreme Court has

> established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact.... Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130 (citations and internal quotations omitted).

The amended complaint has set forth no factual allegations that satisfy the injury-in-fact element. Section 3604(a) makes it unlawful to *refuse or deny* housing to persons based on their race, color, religion, sex, familial status, or national origin. Yale has neither refused to provide residence hall accommodations to the plaintiffs nor denied the plaintiffs rooms in the residence halls. Rooms in the residence halls remain vacant at Yale College for the plaintiffs' return. The amended complaint fails to satisfy the injury-in-fact element. Accordingly, the plaintiffs lack standing to claim a violation of § 3604(a).

The federal Fair Housing Act also provides, in part, that "it shall be unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling ... because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).

The amended complaint has not satisfied the requisite injury-in-fact element to claim a

tory housing practice or breach." 42 U.S.C.

violation of § 3604(b). The plaintiffs were not denied housing or discriminated against by the terms or conditions of Yale's housing policy. In implementing the housing policy, Yale allowed exemptions for students who satisfied one of two criteria. The plaintiffs satisfied neither. The plaintiffs' requests to live off campus were denied, not because Yale discriminated against them, but because they did not satisfy the exemption criteria. The plaintiffs, therefore, lack standing to claim a violation of § 3604(b).

Finally, Yale argues that the federal Fair Housing Act does not create a duty in the defendants to reasonably accommodate the plaintiffs' religious beliefs.

The amended complaint alleges that "by refusing to accommodate the plaintiffs religious obligations, the defendants have discriminated against the plaintiffs because of their religion."

The reasonable accommodations provision in the federal Fair Housing Act, 42 U.S.C. § 3604(f)(3), pertains only to discrimination against handicapped individuals. Specifically, this subsection provides that refusal to make reasonable accommodations for a handicapped individual constitutes discrimination. 42 U.S.C. § 3604(f)(3)(B). The statute cannot be construed to mean that refusal to make reasonable accommodations constitutes discrimination in any other context. The amended complaint has not alleged that the plaintiffs are handicapped. Consequently, the defendants are not required to make reasonable accommodation.

Having found that the plaintiffs are not aggrieved persons within the meaning of the federal Fair Housing Act, and that the Act does not require the defendants to make reasonable accommodations, the court concludes that the plaintiffs lack standing to claim relief under 42 U.S.C. §§ 3604(a), 3604(b) and 3604(f). Count five as set forth in the amended complaint is hereby dismissed.

## III. *Sherman Antitrust Claims*

### A. *Illegal Tying Arrangement*

The defendants argue that the amended complaint fails to sufficiently allege that Yale

§ 3613(a)(1)(A).

has the requisite economic market power to make the tying arrangement illegal under 15 U.S.C. § 1.[8] The defendants argue that Yale is not unique, therefore, it does not possess sufficient market power in the tying market. Specifically, the defendants contend that "[i]n a futile effort to satisfy the ... element[ ][of] market power[,] the plaintiffs assert that 'a Yale degree has unique attributes that make it without substitute or equal'." The defendants argue that "to establish ... market power based on the uniqueness of a product, the plaintiff must allege ... some special advantage inherent in the product that makes the product unique."

The plaintiffs respond that "a Yale education is sufficiently unique to confer economic power." The plaintiffs contend that this is supported by the allegations "that a Yale degree is of incomparable value to potential employers and to graduate schools and that only a Yale degree provides unique lifetime advantages, including access to the worldwide network of Yale alumni." The plaintiffs assert that "these allegations of uniqueness meet the burden of pleading the market power element of a tying claim."

■■ Section One of the Sherman Antitrust Act provides, in part, that "every contract ... in restraint of trade or commerce among the several States ... is hereby declared illegal." 15 U.S.C. § 1. Under Section One, a tying arrangement is " 'an agreement by a party to sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product.' " *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1516–17 (2d Cir.1989)(quoting *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)). To sufficiently state a claim of an illegal tie, a plaintiff must allege

> five specific elements: first, a tying and a tied product; second, evidence of actual coercion by the seller that in fact forced

the buyer to accept the tied product; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; fourth, anticompetitive effects in the tied market; and fifth, involvement of a 'not insubstantial' amount of interstate commerce in the tied market.

*Yentsch v. Texaco, Inc.*, 630 F.2d 46 (2d Cir.1980)(internal citations omitted).

■■ The Supreme Court "ha[s] condemned tying arrangements when the seller has some special ability—usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13–14, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). The market must·be defined so as "to include all reasonable substitutes for the product." *Id.* at 37–38, n. 7, 104 S.Ct. 1551 (O'Connor, J., concurring). One way a seller can achieve market power or "appreciable economic power" is by producing a unique product, which has little or no competition from functionally similar products or services. *See Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14, 16 (1st Cir.1994), *cert. denied*, 513 U.S. 964, 115 S.Ct. 427, 130 L.Ed.2d 340 (1994). Consumer preference for a "brand name alone does not establish product 'uniqueness' necessary for [appreciable economic power]." *Id.* at 17.

In *Lee*, the First Circuit held that the University of Rhode Island's ("URI") policy to condition semester registration upon the payment of a fee for use of the on-campus health clinic was not an illegal tying arrangement. *Id.* at 15. The university required full-time undergraduate students to pay the health clinic fee. *Id.* In order to use the clinic, students were also required to carry supplemental insurance. The university offered supplemental insurance through "a private health care underwriter, which URI sponsor[ed] as its 'default' insurer." *Id.* The

---

**8.** "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court." 15 U.S.C. § 1.

plaintiffs alleged that "conditioning continued matriculation at URI on payment of the . . . clinic fee and/or the . . . supplemental insurance premium" was an illegal tying arrangement. *Id.*

The court explained that "URI obviously is a 'unique' institution in a colloquial sense, [however, the] appellants cannot claim that other institutions of higher education do not or cannot provide 'functionally similar' educational offerings to potential URI applicants." *Lee,* 23 F.3d at 17. Therefore, the court held that the plaintiffs had failed to state a claim that URI possessed appreciable economic power "in the tying market for a university education." *Id.*

In opposing the within motion, the plaintiffs argue that "because [they] have alleged that a Yale education is unique, they have sufficiently stated their tying claim." With respect to the uniqueness of a product, the Supreme Court has explained, however, that "the question is whether the seller has some advantage not shared by his competitors in the market for the tying product. Without any such advantage differentiating his product from that of his competitors, the seller's product does not have the kind of uniqueness considered relevant in prior tying-clause cases." *United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 620–21, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977)(Fortner II).

The amended complaint alleges that "by conditioning the provision of a Yale education on the purchase of unrelated housing services, the defendants are engaged in an illegal restraint of trade", which is in violation of Section One of the Sherman Antitrust Act. The amended complaint further alleges that Yale is unique and that this uniqueness confers sufficient economic power in the educational market. Specifically, Yale's uniqueness is embodied in its "value to potential employers and graduate schools . . . and certain important advantages, such as the worldwide network of Yale Alumni".

The amended complaint has not specifically alleged whether the tying market in this case is a general university education or an Ivy League education. Moreover, the amended complaint does not allege that there are no universities functionally equivalent to Yale College in either of these educational markets. Consequently, the amended complaint fails to allege that Yale is unique beyond the colloquial meaning of the word as the First Circuit explained in *Lee.*

Furthermore, the amended complaint fails to allege that a Yale degree has some advantage that no other universities in the educational market possess. Even if, as plaintiffs contend, "Yale [is] one of the world's most elite academic institutions", preference for brand name alone does not establish the requisite uniqueness necessary to confer appreciable market power. *See Lee v. Life Ins. Co. of N. Am.,* 23 F.3d 14, 17 (1st Cir.1994). As a result, the court concludes that Yale does not possess the character of uniqueness needed to confer market power.

The amended complaint, therefore, fails to sufficiently allege that Yale has the requisite economic market power in the tying product market—in either the broader university education market or the narrower Ivy League education market—to coerce the plaintiffs to accept the tied-product—residence hall accommodations.

### B. *Monopoly Claim.*

The defendants argue that the amended complaint has failed to define a relevant geographic and product market under 15 U.S.C. § 2.[9] Specifically, the defendants contend "to the extent that plaintiffs are claiming that the relevant market consists only of student housing owned by Yale, they have failed to take into account other available housing." The defendants further argue that the amended complaint's relevant market definition fails "to take plainly interchangeable products into account [and] also flies in the

**9.** "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court." 15 U.S.C. § 2.

face of the settled principle that power over one's own products does not create a cognizable antitrust issue."

The plaintiffs respond that "Yale's on-campus residence rules for its college freshmen and sophomores exert market power that monopolists would envy. The relevant market is Yale student housing, and Yale exercises monopoly power over it." The plaintiffs further respond that "Yale's on-campus housing is not interchangeable with housing not owned by Yale in the New Haven area by virtue of Yale's housing policy. [Thus,] [f]or *pleading* purposes, the plaintiffs have defined the relevant market by proper 'reference to the rule of reasonable interchangeability' and cross-elasticity of demand." (emphasis in original).

■ Section Two of the Sherman Antitrust Act provides, in relevant part, that "[e]very person who shall monopolize . . . any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony." 15 U.S.C. § 2 (1997). The Supreme Court has explained that a

> monopoly under § 2 of the Sherman Antitrust Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

■ The pleading requirements for a monopoly claim place "the burden of defining the relevant market" on the plaintiffs. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1385, 140 L.Ed.2d 645 (1998). A complaint may be dismissed if it fails to define a relevant market by reference to the rule of reasonable interchangeability or cross-elasticity of demand. *Id.* In other words, a complaint may be dismissed if the definition of relevant market excludes any reasonably interchangeable substitute products. *Id.*

■ To determine whether the complaint's proposed relevant market definition is legally sufficient, a court must analyze "not [the] commodities reasonably interchangeable by a particular plaintiff, but commodities reasonably interchangeable by consumers for the same purposes." *Queen City Pizza, Inc.*, 124 F.3d at 438 (internal quotation and citation omitted). Moreover, "[w]here the relevant market proposed by the plaintiff is not even *alleged* to encompass all interchangeable substitute products, the market is legally (rather than factually) insufficient, and a motion to dismiss is appropriate." *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 347, n. 23 (N.D.Ill.1997).

In *Rohlfing*, the plaintiffs claimed that a nursing home facility, Manor Care, violated Section Two of the Sherman Antitrust Act by requiring the residents to purchase medications from a designated pharmacy, Vitalink. *Id.* at 333–34. Manor Care owned 82.3% interest in Vitalink. *Id.* Manor Care's pharmaceutical policy permitted residents to purchase medications from a different pharmacy provided that the alternative pharmacy "compl[ied] with the strict packaging rules enforced at Manor Care facilities." *Id.* at 334. Most residents selected Vitalink to supply pharmaceutical services because other pharmacies were either not able to or not willing to comply with the packaging requirements. *Id.*

In *Rohlfing*, the plaintiff alleged that the relevant market Manor Care monopolized was "the sale of pharmaceutical products to residents of Manor Care nursing home facilities." *Id.* at 345. The court explained that the plaintiff had only alleged there were no reasonable substitutes for the pharmaceutical services available on the supply side. However, the plaintiff failed to properly address the demand side. *Rohlfing*, 172 F.R.D. at 345–346. Specifically, the court explained that if the residents were not satisfied with the pharmaceutical services or prices they could have selected a different nursing home that did not use Vitalink. *Id.* at 346.

The failure to address the demand side was fatal to the plaintiff's complaint. The court held that "the relevant market . . . cannot be limited to Manor Care facilities

alone: it must be broad enough to encompass all nursing facilities whose services are 'reasonably interchangeable' with those provided by Manor Care." *Id.*

■ *Rohlfing* is instructive. The amended complaint, here, similarly has failed to allege all reasonably interchangeable substitutes in the relevant market. The amended complaint alleges that the "relevant market monopolized by Yale is the housing market for Yale students in New Haven." In the alternative, the amended complaint alleges that "the relevant market is the market for non-subsidized rental housing in the City of New Haven."

A legally sufficient definition of a relevant market is not defined by reference to a particular plaintiff, but by reference to services or commodities that are reasonably interchangeable. Specifically, a relevant market must be defined by reference to the commodities or services purchased by general consumers for purposes similar to those of the plaintiff. *See, e.g., Queen City Pizza, Inc.,* 124 F.3d 430.

In this case, the amended complaint's allegation that the relevant market is housing for Yale students fails to include all interchangeable substitutes. The plaintiffs could have opted to attend a different college or university if they were not satisfied with Yale's housing policy. *See, e.g., Rohlfing,* 172 F.R.D. at 346. Although the plaintiffs argue that Yale is unique and does not have a reasonable substitute, the court has already dismissed this argument with respect to the plaintiffs' tying claim. Similarly, the court is not persuaded by the same argument in their monopoly claim.

In support of their monopoly claim, the plaintiffs rely on *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59 (2d Cir.1997). In *Hamilton,* Hamilton College promulgated a housing policy by which all students were required to live on campus. The plaintiffs alleged that the university housing policy created a monopoly for the college, which affected interstate commerce. *Id.* at 61–62. The defendants moved to dismiss the plaintiffs' complaint on the premise that the university was not-for-profit, therefore, it did not fall under the purview

of the Sherman Antitrust Act. *Id.* at 62. The district court agreed and dismissed the claim. *Id.* The plaintiffs appealed and the Second Circuit reversed. The Second Circuit explained that the mere status as a non-profit educational institution could not shield the college from antitrust regulation. *Id.* at 63–64.

The court further explained that activities associated with education institutions exist on a continuum and they must be analyzed to determine if the activities do in fact affect interstate commerce. *Hamilton Chapter of Alpha Delta Phi, Inc.,* 128 F.3d at 64–66. The court, therefore, held that because Hamilton College's housing policy could reasonably be deemed to affect interstate commerce, dismissal on this ground was improper. *Id.* at 67.

*Hamilton* lends support to the plaintiffs' monopoly claim only to the extent that Yale's housing policy can be reasonably deemed to affect interstate commerce. *Hamilton,* however, does not support the plaintiffs' definition of the relevant market. Accordingly, the amended complaint has failed to define a relevant market within which Yale possesses a monopoly power.

Therefore, the amended complaint has failed to state a claim for relief under 15 U.S.C. §§ 1 and 2. Consequently, counts seven and eight as set forth in the amended complaint are hereby dismissed.

IV. *Breach of Contract and Unjust Enrichment Claims*

■ It is axiomatic that when all federal claims are disposed prior to trial, a federal court should decline to exercise jurisdiction over any remaining state law claims. *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *DiLaura v. Power Authority of New York,* 982 F.2d 73, 80 (2d Cir.1992). Based upon this precept, the court declines to exercise jurisdiction over the state law claims of breach of contract and unjust enrichment. Thus, counts six and nine as set forth in the amended complaint are hereby dismissed.

## CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss (document no. 11) is hereby GRANTED.