CONTINENTAL ORTHOPEDIC APPLIANCES, INC., New York Orthopedic, Stahl Surgical Supply Inc., United Orthopaedic Appliances, Inc., A-1 Surgical and Medical Supplies, Inc., Archfame, Inc., Ortho Surgical, J.C. Orthopedic Co., Inc., Day Drug & Orthopedic Treatment Facility, Orthotic Consultants, Inc., James Case Enterprises, Inc., Certified Orthopedic, Prothotic Labs, Elmont Pharmacy & Surgical, Foot Molds, Inc., and A Personal Touch Garment Corporation, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

HEALTH INSURANCE PLAN OF GREATER NEW YORK, INC., Advanced Orthopedic Technologies, Inc., A wholly owned subsidiary of Novacare Prosthetics and Orthotics, Inc., Novacare Prosthetic and Orthotics, Inc., and Arimed Orthotics, Prosthetics, and Pedorthics Inc., Andrew H. Meyers, Matthew Mironis, Steven Mironis, Bernard Neeck and Anthony L. Watson, Defendants.

No. CV 95-4541.

United States District Court,
E.D. New York.

Jan. 15, 1999.

110

Steven L. Wittels, Armonk, NY, Jeremy Heisler, New York City, Meister Seelig &

Fein, LLP, New York City by Scott N. Gelfand, of counsel, for plaintiffs.

Stroock & Stroock & Lavan LLP, Bernard Neeck and Anthony Watson, New York city by Bruce H. Schneider, David Markowitz, Claude G. Szyfer, of Counsel, for defendants Health Insurance Plan of Greater New York, Inc.

Herrick, Feinstein LLP, New York City, by Joshua F. Scheier, Susan T. Dwyer, of counsel, for defendants Advanced Orthopedic Technologies, Inc., Novacare Prosthetic and Orthotics, Inc., and Andrew H. Meyers.

Capetanakis & Preite, Matthew Mirones and Steven Mirones, Brooklyn by Charles Capetanakis, of counsel, for defendants Arimed Orthodics, Prosthetics, and Pedorthics, Inc.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This putative class action seeks redress for alleged violations of the federal and state antitrust laws arising from the defendants' alleged unlawful and conspiratorial bid-rigging, price fixing, and termination and exclusion of all orthotic and prosthetic ("O & P") providers within the five boroughs of New York City and the surrounding six Counties of Nassau, Suffolk, Westchester, Rockland, Orange and Putnam (the "11 Counties"), by the defendants Health Insurance Plan of Greater New York, Inc. ("HIP"), Advanced Orthopedic Technologies, Inc. ("Advanced"), Novacare Orthotics and Prosthetics, Inc. ("Novacare"), Arimed Orthotics, Prosthetics and Pedorthics, Inc. ("Arimed"), and five individual officers and executives of the corporate defendants, beginning on or about July 31, 1995, and continuing to date. Presently before the Court are the motions of the defendants to dismiss the plaintiffs' Second Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted.

## I. BACKGROUND

### A. Factual background

This lawsuit arises from a decision made by HIP, a health management organization ("HMO"), to enter into certain exclusive contracts for O & P service with Advanced and Arimed, which became effective on August 1, 1995 and February 13, 1997. On or about November, 1996, Novacare, through a wholly-owned subsidiary, purchased all the assets of Advanced and the surviving corporation allegedly agreed to assume all of Advanced's liabilities. Accordingly, the plaintiffs submit that Novacare is liable for any wrongful activities committed by Advanced as alleged in the Second Amended Complaint. Therefore, this Opinion will refer to Advanced as "Advanced/Novacare," unless specifically referring separately to either "Advanced" or "Novacare."

Orthotics is the design, fabrication, fitting, and supervised use of custom-made braces and other devices that provide external support to treat musculoskeletal disorders. Prosthetics is the design, fabrication, and fitting of custom-made artificial limbs for patients who have lost limbs as a result of traumatic injuries, diabetes, cancer, mastectomy, vascular disease, or congenital disorders. The facts set forth below are taken from the Second Amended Complaint.

The first part of the conspiracy is alleged to have commenced on or about July 31, 1995 when Advanced and Arimed contracted to become HIP's exclusive "preferred providers" in regard to O & P services provided to HIP's customers in the Counties of Staten Island, Brooklyn, Queens, Nassau, and Suffolk (collectively, the "Five County Region" or the "Lower County Region"), notwithstanding that these providers, combined, had at most six outlets in these five counties. As a result of these contracts, the former O & P providers, including the plaintiffs, no longer will be the recipient of HIP's business in

the Lower County Region. Simultaneously, each and every O & P provider who had previously attempted to become a HIP provider was foreclosed from becoming a member in the HIP network comprising of the Lower County Region.

HIP allegedly did not notify any of the O & P providers or the affected enrollees of the changes. However, apparently some time later, HIP provided the following memorandum, which it delivered to each terminated provider who inquired as to its termination:

The Health Insurance Plan of Greater New York (HIP) has recently entered into agreements with Advanced Orthopedic Technology and Arimed whereby these two vendors will be preferred providers of O & P services for HIP members in the Queens–Long Island/Brooklyn and Staten Island Regions.

Any cases which have already been referred to your company will continue to be monitored by the HIP Alternate Care Utilization Management Department. However, any new cases as of August 1, 1995 will be referred to one of the preferred providers. [I]f you have any questions or issues with regard to the above change[,] please feel free to contact the HIP Alternate Care Utilization Management Department at (212) 630–8203.

HIP would like to thank you for your past service to HIP Members and appreciates your anticipated cooperation with this transition.

Second Amended Complaint ("2d.Am.Compl.") ¶ 102.

The plaintiffs allege that their termination and exclusion occurred despite their background, experience, training, competence, adherence to the ethics of the profession, good reputation, and the ability to work with others. All plaintiffs were Board-certified pursuant to the American O & P Association ("AOPA") and the New York State O & P Association ("NYOPA"). Nevertheless, only one entity among the plaintiffs was allegedly afforded an opportunity to submit bids to HIP prior to their termination.

On or about February 13, 1997, the plaintiffs allege the second part of the conspiracy materialized when HIP disclosed that it had "extended" exclusive contracts to Advanced/Novacare and Arimed to provide O & P services for "all HIP New York members" in the Counties of New York (i.e., Manhattan), Bronx, Westchester, Orange, Rockland, and Putnam (collectively, the "Upper County Region"). These territories were conferred to Advanced/Novacare and Arimed even though in most counties comprising the Lower and Upper County Regions, Advanced/Novacare and Arimed allegedly had only one or two sites, and in some counties, had no O & P sites to service HIP's customers.

As a result of these contracts, the former O & P providers, including the plaintiffs, would no longer be the recipient of HIP's business in the Upper County Region. Simultaneously, each and every O & P provider who had previously attempted to become a HIP provider was foreclosed from becoming a member in the HIP network in the Upper County Region.

The plaintiffs allege that HIP did not timely notify any of the affected O & P providers or the affected enrollees of the changes. Rather, HIP prepared a memorandum dated February 13, 1997, which mirrored the language of the July 31, 1995 termination letter, stating that HIP had "recently extended" its "agreements" with Advanced/Novacare and Arimed "whereby these two vendors will be preferred providers of orthotic and prosthetic services for all HIP New York Members." 2d. Am. Compl. ¶ 108. In a later memorandum dated March 15, 1997, which was provided only to HIP personnel on a distribution list, HIP detailed the partitioning of the Upper County Region among Advanced/Novacare and Arimed. HIP allegedly gave no explanation to its personnel for the sudden "extension" of coverage of

the Upper County Region to Advanced/Novacare and Arimed. *Id.* None of the plaintiffs were allegedly afforded an opportunity to submit bids to HIP prior to their termination.

The plaintiffs allege that the conduct outlined above constitutes an illegal conspiracy among HIP, Advanced/Novacare, and Arimed, in restraint of trade of health care delivery in the United States and the State of New York. In support of this contention, the plaintiffs assert that during the relevant time periods of their complaint, HIP possessed over 20% of the Health Maintenance Organization ("HMO") market in the eleven County region, and approximately 50% of all O & P patients in that region who used an HMO. As a result, and crucial to the outcome of this motion, the plaintiffs claim that the defendants restrained trade in two separate relevant product markets: (1) The market for O & P health care services to HIP's HMO patients in the eleven Counties; and (2) The market for O & P health care services to HMO patients in the eleven County region.

The plaintiffs' Second Amended Complaint alleges that the essence of the agreement by the defendants seeks to: (1) sharply reduce and/or virtually eliminate the furnishing of O & P services to HIP's captive O & P patient population, thereby allowing HIP to avoid its contractual obligation to pay for O & P services incurred by its patients; (2) channel HIP's captive O & P patients exclusively to defendants Advanced/Novacare and Arimed, and, in return, it is alleged that Advanced/Novacare and Arimed agreed to provide minimal substandard O & P services to HIP patients, and/or withhold services outright from such patients; (3) engage in an unlawful and illegal bid rigging scheme under which the defendants exclude qualified providers from participating in the bidding process for the purpose of awarding O & P contracts solely to Advanced/Novacare and Arimed; (4) unlawfully fix prices for O & P services by HIP, Advanced/Novacare

and Arimed in conjunction with their exclusive contractual arrangement to severely limit O & P services to HIP's captive O & P patient population; and (5) financially weaken and/or drive out competing O & P providers so that Advanced/Novacare and Arimed would dominate the HMO market for O & P services in the eleven County area.

The Second Amended Complaint sets forth four antitrust claims, two based on federal law and two based on state law. The first and second claims allege structural and tacit conspiracies, respectively, in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The third and fourth claims allege companion antitrust conspiracy claims based on the New York State Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*

### B. *Procedural history*

The plaintiffs' original complaint alleged structural and tacit conspiracies and monopolization pursuant to federal and state law. By a Memorandum Decision and Order dated February 26, 1997, the Court dismissed with prejudice all claims of monopolization and dismissed the complaint without prejudice, as to the plaintiffs United Orthopaedic Appliances, Inc., Stahl Surgical Supply, Inc., Archfame, Inc., J.C. Orthopedics Co., Inc., and James Case Enterprises, Inc., based on lack of standing. *Continental Orthopedic Appliances, Inc. v. Health Insurance Plan of Greater New York*, 956 F.Supp. 367 (E.D.N.Y.1997) ("*Continental I*"). In addition, the Court dismissed without prejudice, the federal and state law conspiracy claims, finding the conspiracy allegations insufficient to state a claim. The Court held that the plaintiffs had successfully pleaded all elements of a section 1 violation of the Sherman Antitrust Act, 15 U.S.C. § 1, except the allegations of a conspiracy. The Court stated that the complaint asserted

only conclusory allegations of a conspiracy. In fact, the only factual bases for the "conspiracy" are the agreements by

HIP to terminate the plaintiffs as O & P providers and, instead, replace them with the defendants Advanced and Arimed. There are no facts set forth in support of a claim of a conspiracy in restraint of trade other than the replacement of the plaintiffs and the exclusive provider contracts with the two defendants.

*Continental,* 956 F.Supp. at 373. The Court observed:

> that if it were to rule that these facts alone could state a valid Section 1 antitrust conspiracy cause of action, then every such exclusive contract under similar facts could be the basis for a Section 1 conspiracy antitrust action. That the plaintiffs' complaint alleges a conspiracy based only on the facts that the defendant HIP terminated the plaintiff and chose two other preferred providers, is clear from a reading of the complaint.

*Id.* at 373–74. Rather than dismissing the plaintiffs' claims with prejudice, the Court granted the plaintiffs an opportunity to replead their claims but cautioned against squandering this opportunity by making "perfunctory or cosmetic changes." *Id.* at 374. The Court denied the defendants' motion to dismiss in all other respects.

The plaintiffs filed their First Amended Complaint on April 25, 1997, adding five individual defendants who are executives of HIP, Advanced, and Arimed, and asserting allegations of their exclusion from the HIP network encompassing the Upper County Region.

By a Memorandum Decision and Order dated February 7, 1998, the Court held that:

> viewing the totality of the plaintiffs' allegations, accepting these allegations as true, construing all inferences in favor of the plaintiffs, and bearing in mind the very stringent burden on a moving defendant in an antitrust case, the Court finds that the plaintiffs have alleged a conspiracy cause of action under section 1 of the Sherman Act.

*Continental Orthopedic Appliances, Inc. v. Health Insurance Plan of Greater New York,* 994 F.Supp. 133, 140 (E.D.N.Y.1998) (*"Continental II"*). Therefore, the Court denied the defendants' motion to dismiss the First Amended Complaint for failure to sufficiently state a claim of conspiracy under section 1 of the Sherman Act.

While the Court found that the plaintiffs had adequately pled a claim of conspiracy under section 1 of the Sherman Act, the Court revisited the issue of market definition, which it had summarily deemed to be without merit in *Continental I.* The Court held in *Continental II,* that the plaintiffs failed to allege what percentage of the O & P market HIP possesses, and thus stated that it was unable to determine whether their claim properly alleged a relevant geographic and product market in which trade was unreasonably restrained or monopolized. Specifically, the Court held that "the Court finds that the plaintiffs' definition of a relevant product market consisting of only O & P health care services to all HIP's enrollees, does not properly define a relevant product market." *Id.* at 141. The Court, however, afforded the plaintiffs an opportunity to replead the relevant product market in a Second Amended Complaint.

In *Continental II* the Court also dismissed the First Amended Complaint as it pertained to Novacare. While the plaintiffs asserted that Novacare purchased all of the assets of Advanced in December, 1996, the Court held that the First Amended Complaint had not satisfied the requirements of notice pleading to properly assert a violation of Section 1 of the Sherman Act against Novacare. As such, the Court dismissed the First Amended Complaint against Novacare, but granted the plaintiffs' request for leave to amend their complaint.

On March 24, 1998, the plaintiffs filed their Second Amended Complaint. In response, the defendants filed separate motions to dismiss. In support of their contention that the Second Amended

Complaint should be dismissed, the defendants assert that the plaintiffs have failed to adequately define the relevant product market. On the other hand, the plaintiffs claim that the Court does not have to examine the relevant product market because the defendants' practices were so plainly anti-competitive that they are conclusively presumed to be in violation of the Sherman Act. Thus, the plaintiffs contend that the Court should follow the *"per se"* rule, rather than the "rule of reason." In the alternative, the plaintiffs contend that their Second Amended Complaint satisfactorily defines the relevant product market thus warranting the denial of the defendants' motions.

In particular, the plaintiffs define the relevant product market as: (1) The market for O & P health care services to HIP's HMO patients in the eleven Counties; and (2) The market for O & P health care services to HMO patients in the eleven County region.

## II. DISCUSSION

### A. *Fed.R.Civ.P. 12(b)(6) standard*

On a motion to dismiss for failure to state a claim, "the court should not dismiss the complaint pursuant to Rule 12(b)(6) unless it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim' which would entitle him to relief.'" *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052–53 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994). The Second Circuit stated that in deciding a Rule 12(b)(6) motion, a court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Samuels v. Air Transport Local 504,* 992 F.2d 12, 15 (2d Cir.1993); *see also International Audiotext Network, Inc. v. AT & T,* 62 F.3d 69, 72 (2d Cir.

1995); *Paulemon v. Tobin,* 30 F.3d 307, 308–09 (2d Cir.1994); *Rent Stabilization Ass'n of the City of New York v. Dinkins,* 5 F.3d 591, 593–94 (2d Cir.1993) (citing *Samuels,* 992 F.2d at 15).

It is not the Court's function to weigh the evidence that might be presented at a trial; the Court must merely determine whether the complaint itself is legally sufficient, *see Goldman,* 754 F.2d at 1067, and in doing so, it is well settled that the Court must accept the allegations of the complaint as true, *see Leeds v. Meltz,* 85 F.3d 51 (2d Cir.1996); *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Proctor & Gamble Co. v. Big Apple Industrial Bldgs., Inc.,* 879 F.2d 10, 14 (2d Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990), and construe all reasonable inferences in favor of the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Leeds, supra,* 85 F.3d at 51; *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1099 (2d Cir. 1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989).

The Court is mindful that under the modern rules of pleading, a plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief", Fed.R.Civ.P. 8(a)(2), and that "[a]ll pleadings shall be so construed as to do substantial justice," Fed.R.Civ.P. 8(f).

The issue before the Court on a Rule 12(b)(6) motion "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claim." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995), *cert. denied,* 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996) (citing *Scheuer,* 416 U.S. at 235–36, 94 S.Ct. 1683). Recovery may appear remote and unlikely on the face of the pleading, but that is not the test for dismissal under Rule 12(b)(6). *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (cit-

ing *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683).

In addition, in antitrust cases, it must appear on the face of the complaint that the plaintiff could prove no set of facts to sustain a recovery. *Ware v. Associated Milk Producers, Inc.*, 614 F.2d 413 (5th Cir.1980). The complaint need only allege sufficient facts to state the elements of injury from an act prohibited by the antitrust laws. *Newman v. Universal Pictures*, 813 F.2d 1519 (9th Cir.1987), *cert. denied*, 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988). On the other hand, for the court to grant this kind of motion, a defendant in an antitrust case must meet a more stringent standard because the proof is often in the hands of the alleged conspirators, and the plaintiff may need an opportunity to discover the facts necessary to withstand the motion. *HRM, Inc. v. Tele-Communications, Inc.*, 653 F.Supp. 645 (D.Colo.1987); *Hughes Automotive v. Mid–Atlantic Toyota Distibutors, Inc.*, 543 F.Supp. 1056 (D.Md.1982). That being said, an antitrust complaint still must "adequately ... define the relevant product market, ... allege antitrust injury, [and] ... allege conduct in violation of antitrust laws." *Re–Alco Indus., Inc. v. National Ctr. Of Health Educ., Inc.*, 812 F.Supp. 387, 391 (S.D.N.Y.1993).

It is within this framework that the Court addresses the present motions to dismiss.

### B. *The defendants' motions*

#### 1. *Relevant Product Market*

"Market share ... is one of the most important factors to be considered when determining the probable effect of the combination of ... competition in the relevant market." *Brown Shoe Co. v. United States*, 370 U.S. 294, 343, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). As this Court has already found that the plaintiffs adequately set forth a claim of conspiracy in their First Amended Complaint (*see Continental II*), the only question before the Court is whether the plaintiffs have now properly alleged the existence of an unreasonable restraint of trade, either *per se* or under the "rule of reason."

The Second Circuit has held that "[i]f a ... plaintiff establishes the existence of an illegal contract or combination, it must then proceed to demonstrate that the agreement constituted an unreasonable restraint of trade either per se or under the rule of reason." *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs.*, 996 F.2d 537, 542 (2d Cir.1993) ("Capital Imaging"). On a motion to dismiss, under the rule of reason, the plaintiff must "identify the relevant product market and allege how the net effect of the alleged violation is to restrain trade in the relevant market." *North Jersey Secretarial Sch., Inc. v. McKiernan*, 713 F.Supp. 577, 583 (S.D.N.Y.1989). In contrast, under the *per se* rule the plaintiff is excused from defining the relevant product market. The Second Circuit in *Capital Imaging* stressed, however, that "[c]onduct considered illegal per se is invoked only in a limited class of cases where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are conclusively presumed illegal without further examination." *Id.* (citations omitted). The Court in *Capital Imaging* continued, "[p]er se violations include, for example, horizontal and vertical price-fixing, division of a market into territories, certain tying arrangements, and some group boycotts involving concerted refusals to deal with a competitor." *Id.* at 542–543 (citations omitted). The Second Circuit emphasized, however, that "[m]ost cases fall outside these narrow, carefully demarcated categories held to be illegal per se. In the general run of cases a plaintiff must prove an antitrust injury under the rule of reason." *Id.* Furthermore, courts have been extremely reluctant to exercise the *per se* analysis where the alleged conspiracy is vertical, rather than horizontal, as is the case before this Court. *See e.g., Finkelstein v.*

*Aetna Health Plans of N.Y.*, 1997 WL 419211, \*5 (S.D.N.Y. July 25, 1997) (citing *Business Elec. v. Sharp Elec.*, 485 U.S. 717, 724, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988)).

 Under the rule of reason, a plaintiff who alleges an antitrust violation bears the burden of establishing "that the challenged action has had an actual adverse effect on competition as a whole in the relevant market." *Id.* Stated another way, the plaintiff must "allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized." *Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*, 960 F.Supp. 701, 704 (S.D.N.Y.1997) (citations omitted). In addition, the complaint must allege a relevant product market in which the anti-competitive effects of the challenged activity can be assessed. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). It should be noted that when determining the relevant product market, the plaintiff should include all products reasonably interchangeable. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). In other words, the relevant product market must include all reasonable substitutes for a product. "A properly defined market includes potential suppliers who can readily offer consumers a suitable alternative to the defendants' services." *United States v. Long Island Jewish Medical Center*, 983 F.Supp. 121 (E.D.N.Y.1997) (quoting *F.T.C. v. Butterworth Health Corp.*, 946 F.Supp. 1285, 1290 [W.D. Mich.1996], *aff'd* 121 F.3d 708 [6th Cir.1997]).

 In the present case, the plaintiffs urge the Court to find that the defendants conduct was *per se* illegal, thus eliminating the relevant market requirement in their Second Amended Complaint. As already stated, *per se* illegality is strictly limited to defined categories that have "such predictable and pernicious anticompetitive effect[s], and such limited potential for pro-competitive benefit[s]" to warrant such treatment. *State Oil Co. v. Khan*, 522 U.S. 3, 118 S.Ct. 275, 279, 139 L.Ed.2d 199 (1997). It is not obvious to this Court that the defendants engaged in price-fixing, bid-rigging, or a conspiracy to reduce output when they entered into an exclusive dealing arrangement. In addition, courts have recognized that such exclusive dealing agreements may have procompetitive effects. *See e.g., Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*, 129 F.3d 240, 245 (2d Cir. 1997); *Barry v. Blue Cross of Cal.*, 805 F.2d 866, 871 (9th Cir.1986); *Royal Drug Co. v. Group Life and Health Ins. Co.*, 737 F.2d 1433 (5th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 925 (1985); *Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Conn., Inc.*, 675 F.2d 502, 506 (2d Cir. 1982); *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir.1978) (en banc). Therefore, given the strict limitations and the reluctance to apply the *per se* rule to a vertical antitrust action, the Court finds that the plaintiff must sufficiently plead a relevant product market.

Having decided that the *per se* analysis is inapplicable, the Court turns its attention to whether the plaintiffs adequately pled a relevant product market in their Second Amended Complaint. The plaintiffs put forward two separate relevant product markets in their Second Amended Complaint. The Court will consider each separately.

2. *The market for O & P health care services to HIP's HMO patients in the eleven Counties*

The plaintiffs' First Amended Complaint defined the relevant product market as "O & P health care services to all HIP's enrollees." 2d. Am. Compl. ¶ 88. In *Continental II*, however, the Court held that this definition was "not an economically viable product market." The Court's decision was based, in part, on the failure of the plaintiffs to include in their definition

of the relevant product market the percentage of the O & P market that HIP possesses. In addition, relying on the Second Circuit's decision in *Capital Imaging*, the Court was reluctant to support the plaintiffs' assertion that a single firm's product can constitute a relevant product market. *Continental II*, 994 F.Supp. at 140–141.

While the Court provided the plaintiffs with an opportunity to replead the complaint, the Court stated that "the relevant product market cannot consist of merely HIP's O & P referrals. To this extent, the Court finds that the plaintiffs' definition of a relevant product market consisting of only O & P health care services to all HIP's enrollees, does not properly define a relevant product market." *Id.* at 141. Despite the Court's holding, the plaintiffs' Second Amended Complaint defines the relevant product market as "O & P health care services to HIP's HMO patients in the eleven Counties." The Court finds that the difference between the First Amended Complaint and the Second Amended Complaint, with regard to this definition, is de minimis. Therefore, the Court adheres to its decision in *Continental II* and holds that the plaintiffs' definition of the relevant product market as "O & P health care services to HIP's HMO patients in the eleven Counties" is not a viable relevant product market.

### 3. *The market for O & P health care services to HMO patients in the eleven County region*

■ In support of their contention that the relevant product market consists of O & P health care services to HMO patients in the eleven County region, the plaintiffs state in their Second Amended Complaint that "[a]t all relevant times alleged herein, HIP possessed over 20% of the HMO market in the eleven-county region, and approximately 50% of all O & P patients in that region who used an HMO." 2d. Am. Compl. ¶ 7. Implicitly, therefore, the plaintiffs ask the Court to approve their definition of the relevant product market despite the fact that it does not appear that it takes into consideration all reasonable substitutes for the product and services that are the cornerstone of their antitrust claim. While the plaintiffs highlight that HIP possesses over 50% of all O & P patients in the eleven county region who use an HMO, the plaintiffs' definition fails to take into account other forms of health care and financing that provide O & P coverage, such as traditional indemnity plans, preferred provider organizations, or Medicare and Medicaid programs. If the entire health care financing industry in the eleven Counties were taken into account, there is no indication in the Second Amended Complaint as to what percentage of O & P patients HIP possesses. Certainly, however, it would be less than 50% of the entire health care market.

There is some support in other Circuits for the notion that the entire health care financing industry, rather than the HMO industry, is the appropriate relevant product market. *See e.g., Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1408–11 (7th Cir. 1995); *U.S. Healthcare Inc. v. Healthsource, Inc.*, 986 F.2d 589, 598 (1st Cir. 1993); *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325, 1330–1337 (7th Cir.1986). In *Marshfield Clinic*, for example, the Seventh Circuit per Chief Judge Posner, analyzed whether the jury defined the relevant market appropriately, and stated, "[t]he services offered by HMOs and by various fee-for-service plans are both provided by the same physicians, who can easily shift from one type of service to another if a change in relative prices makes one type more lucrative than others." *Marshfield Clinic*, 65 F.3d at 1411. As a result, the court held that a reasonable jury could not conclude that a product market limited solely to HMOs constituted a separate market. *Id.* Similarly, in *U.S. Healthcare*, the First Circuit described the healthcare market as follows:

There are familiar alternatives to HMOs. At the "financing" end, these include traditional insurance company policies that reimburse patients for doctor or hospital bills without limiting the patient's choice of doctor, as well as Blue Cross/Blue Shield plans of various types and Medicare and Medicaid programs. At the "provider" end, there is also diversity. Doctors may now form so-called preferred provider organizations, which may include peer review and other joint activities, and contract together to provide medical services to large buyers like Blue Cross or to "network" model HMOs. There are also ordinary group medical practices. And, of course, there are still doctors engaged solely in independent practice on a fee-for-service basis.

*U.S. Healthcare,* 986 F.2d at 591.

While the Court agrees with the holdings of the Seventh Circuit in *Marshfield Clinic* and the First Circuit in *U.S. Healthcare,* neither of those cases, or for that matter, any of the cases cited in the defendants briefs, stand for the proposition that HMOs can never be a separate viable product market. Moreover, the decisions in both *Marshfield Clinic* and *U.S. Healthcare* were after trial. In fact, Judge Posner emphasized that the court's findings were based on the "record compiled in the district court." *Marshfield Clinic,* 65 F.3d at 1411.

On January 15, 1999, at oral argument, counsel for the defendants HIP, Bernard Neeck, and Anthony Watson, brought to the Court's attention three cases that had not been discussed in its brief. Counsel for the defendants cited *Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.* ("Jefferson Hospital"), 123 F.3d 301 (5th Cir.1997), *Hack v. The President and Fellows of Yale College* ("Yale College"), 16 F.Supp.2d 183 (D.Conn.1998), and *HTI Health Services, Inc. v. Quorum Health Group, Inc.* ("HTI Health Services"), 960 F.Supp. 1104 (S.D.Miss.1997) for the proposition that the plaintiffs have not properly defined the relevant product market. The Court disagrees. The decision in *Jefferson Hospital* was made in the context of a motion for summary judgment, while the holding in *HTI Health Services* was based on the record at trial. Finally, while the Court agrees with the decision in *Yale College,* the underling facts on which the District Court of Connecticut based its decision are different from those before this Court. In *Yale College,* the plaintiffs claimed that the relevant product market consisted of student housing owned solely by Yale. In support of its contention, the plaintiffs' amended complaint alleged that "Yale is unique and that this uniqueness confers sufficient economic power in the educational market. Specifically, Yale's uniqueness is embodied in its 'value to potential employers and graduate schools ... and certain important advantages, such as the worldwide network of Yale Alumni.'" *Yale College,* 16 F.Supp.2d at 195. While the Court recognizes the distinguished alumni who have attended Yale including President William Jefferson Clinton and former Presidents George Bush and William Howard Taft, it is not surprising that the District Court concluded that "Yale does not possess the character of uniqueness needed to confer market power." *Id.* Clearly, as it pertains to the matter before this Court, the obvious finding that Yale in and of itself is not a relevant product market, does not dictate a finding that HMOs can never be a separate viable product market.

The Court has reservations as to whether the relevant product market can properly be defined as the market for O & P health care services to HMO patients in the eleven counties. The plaintiffs claim that because 80% of New York State's population will be HMO members by the end of the decade, and that HIP controls 50% of the O & P patients that use HMOs, they have properly defined the relevant product market. The plaintiffs' Second Amended Complaint also contends that HIP's O & P clientele disproportionately

consist of the elderly, minority members in poverty areas, blue collar or municipal employees, and the chronically ill or disabled. As a result, the plaintiffs maintain that these patients lack the economic resources to transfer to another HMO, or for that matter, any other type of traditional health care provider.

Despite the Court's reservations as to the plaintiffs' restrictive definition of the relevant product market, the Court is of the view that in this particular instance, only discovery can properly determine the commercial realities involved in the health care provider universe. *See e.g., Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 469, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (holding that "the proper market definition . . . can be determined only after a factual inquiry into the commercial realities faced by consumers."); *Envirosource, Inc. v. Horsehead Resource Development Co.*, 1997 WL 525403, *3, 1997 LEXIS 12570, *8 (S.D.N.Y.1997) (holding that "extensive analyses of reasonable interchangeability and cost-elasticity of demand . . . are not required at the pleading state . . . market definition . . . is generally a question of fact which can be determined only after a factual inquiry into the commercial realities faced by consumers.").

Therefore, the Court finds that for the purposes of the defendants' Rule 12(b)(6) motion to dismiss, the plaintiffs have, in their Second Amended Complaint, sufficiently plead the relevant product market as O & P health care services to HMO patients in the eleven Counties. However, whether this definition properly meets the requirements of Section 1 of the Sherman Act will have to wait until the completion of discovery and perhaps the trial.

### 4. *Novacare*

■ The First Amended Complaint named Novacare as a defendant based upon the sole allegation that on or about December 1996 it purchased all the assets of Advanced. The Court's decision in *Con-*

*tinental II* held that the plaintiffs did not satisfy the requirements of notice pleading with regard to Novacare. However, the Court granted the plaintiffs' request for leave to amend their complaint.

The Second Amended Complaint specifically alleges that "Novacare participated in many aspects of defendants' antitrust conspiracy, including the termination of plaintiff O & P providers in 1997." 2d. Am. Comp ¶ 2. In addition, the Second Amended Complaint alleges that:

> Novacare, through a wholly-owned subsidiary, purchased all the assets of defendant Advanced and the surviving corporation agreed to assume all of Advanced's liabilities. Accordingly, Novacare is liable for all the wrongful activities committed by defendant Advanced as alleged in this Complaint.

*Id.*

Assuming that the allegations in the Second Amended Complaint are true, as the Court must in a motion to dismiss, the Court finds that the plaintiffs have sufficiently satisfied the requirements of notice pleadings with regard to Novacare. In this regard, the Court again notes that in an antitrust claim, the basis for the dismissal must meet a more stringent standard because the proof of the antitrust violation is often in the hands of the alleged conspirators. Therefore, giving the plaintiffs the benefit of the doubt, the Court at this juncture denies Novacare's motion to dismiss the complaint.

### III. CONCLUSION

Having reviewed the parties' submissions and heard oral arguments, and for the reasons set forth above, it is hereby

**ORDERED**, that the defendants' motions to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim based on the relevant product market issue is **DENIED**; and it is further

**ORDERED**, that defendant Novacare's separate motion to dismiss the complaint

pursuant to Fed.R.Civ.P. 12(b)(6) is **DE-NIED;** and it is further

**ORDERED,** that the parties are to proceed to discovery before United States Magistrate Judge Boyle immediately and are to now report to Judge Boyle's Chambers.

**SO ORDERED.**